[Cite as *Paganini v. Cataract Eye Ctr. of Cleveland*, 2025-Ohio-275.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOHN PAGANINI,                          :

     Plaintiff-Appellee,          :

                                             Nos. 113867 and 114019

     v.

                                            :

THE CATARACT EYE CENTER
OF CLEVELAND, ET AL.,                   :

     Defendants-Appellants.       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 30, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-971901

---

### *Appearances:*

Petersen & Peterson, Susan E. Petersen, and Todd E. Peterson, *for appellee.*

Bricker Graydon LLP, Bradley D. McPeek, and Kellie A. Kulka; Perez Morris and Christine Santoni, *for appellants.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendants-appellants, Dr. Gregory J. Louis ("Dr. Louis") and The Cataract Eye Center of Cleveland, Inc. ("Cataract Eye Center") (collectively "appellants"), appeal a judgment denying their motion for judgment

notwithstanding the verdict ("JNOV"), following a jury verdict in favor of plaintiff-appellee, John Paganini ("Paganini"), in the amount of $1,487,500.00. Appellants also appeal a judgment finding that R.C. 2323.43(A)(3), a statutory provision placing a cap on noneconomic damages, is unconstitutional as applied to Paganini. They claim the following errors:

1. The trial court erred in denying appellants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

2. The trial court erred in entering judgment for Paganini and finding R.C. 2323.43(A) unconstitutional as applied to Paganini.

{¶ 2} We find that the denial of appellants' motion for JNOV was reasonable due to their waiver of any irregularities in the jury interrogatories and because the jury's answers to the interrogatories are easily reconciled with the evidence and general verdict. We also find that the cap on noneconomic damages provided in R.C. 2323.43(A)(3) is unconstitutional as applied to Paganini. Accordingly, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} On December 9, 2021, Dr. Louis performed cataract surgery on Paganini. The surgery went well, and Paganini returned home the same day. Paganini experienced some pain that evening that he attributed to the surgery. (Tr. 493-494.) And, when Paganini awoke early the next morning, he saw black dots and the number of black dots was increasing. (Tr. 494.)

{¶ 4} Paganini called Dr. Louis's office to report his symptoms, and the call was routed to Dr. Louis's afterhours answering service. The answering service

operator asked Paganini questions to which he replied that he was a current patient, that he was calling about an urgent matter, and that he was seeing black dots that he had not seen before. (Tr. 494-495, and 713-715.) The operator provided Paganini's information to the on-call physician, Dr. Tamar Shafran, at 6:38 a.m. Based on his conversation with Dr. Shafran, Paganini made an appointment to see Dr. Louis later that morning. (Tr. 96-98.)

{¶ 5} When Paganini arrived at Dr. Louis's office on the morning of December 10, 2021, Tammi Dawson ("Dawson"), a certified ophthalmic technician, took Paganini to an examination room where she obtained information about his complaints. Paganini reported that he had aching around his left eye, that his vision was blurry, and that he had "a ton of floaters[.]" (Tr. 475.) Dr. Louis then entered the examination room and asked Paganini about his complaints. He also read Dawson's notes. Paganini told Dr. Louis that his vision was good the day before but that he now had black spots and fog in his vision. (Tr. 392, 498, 600.) Paganini also reported pain in his left eye.

{¶ 6} Dr. Louis examined Paganini's eye. The eye was not red, but Dr. Louis observed some inflammation and signs of a vitreous hemorrhage. (Tr. 394-395.) He admitted at trial that these signs indicate possible endophthalmitis. (Tr. 395-396.) Endophthalmitis is an aggressive eye infection that can lead to vision loss and, ultimately, to loss of the eye itself. (Tr. 379-380.) On December 10, 2021, Dr. Louis did not suspect endophthalmitis because Paganini's symptoms were common among patients after cataract surgery. (Tr. 396-397.)

{¶ 7} Dr. Louis saw "a few white cells," but no evidence of a hypopyon, a medical condition that occurs when white blood cells accumulate in the anterior chamber of eye. (Tr. 402.) A hypopyan is indicative of infection. (Tr. 774.) If Dr. Louis had suspected endophthalmitis, he would have referred Paganini to a retina specialist that same day. (Tr. 398.) Instead, Dr. Louis diagnosed Paganini with a vitreous hemorrhage, i.e., bleeding in the eye from a tear in the retina or blood vessels. (Tr. 394, 592.) However, Dr. Louis could see there was no tear in Paganini's retina and that his retina was still attached at that time. (Tr. 772.) Following the diagnosis, Dr. Louis sent Paganini home.

{¶ 8} The following day, December 11, 2021, Dr. Louis received a message from Paganini's son, John Paganini ("John"), stating that Paganini was experiencing worse pain. Dr. Louis then referred Paganini to Dr. Thomas Hull ("Dr. Hull"), a retina specialist in Akron, Ohio. (Tr. 785-786.) Dr. Hull diagnosed Paganini with acute endophthalmitis. (Tr. 443.) Dr. Hull injected Paganini's eye with two vials of antibiotics. He also prescribed drops for pain and additional antibiotics. (Tr. 501-502.)

{¶ 9} Paganini followed up with another retina specialist the following Monday, December 13, 2021. (Tr. 504.) Paganini also had surgery to treat the infection. However, an ultrasound performed on December 27, 2021, showed that Paganini's retina had detached. (Tr. 506.) At that point, Paganini understood that his loss of vision was permanent. (Tr. 506.) Thereafter, he lost his eye, which

became permanently deformed and requires a future surgery to replace it with a glass eye. (Tr. 507 and 515.)

{¶ 10} On November 29, 2022, Paganini filed a complaint for medical malpractice against appellants. He alleged that Dr. Louis failed to diagnose endophthalmitis during his December 10, 2021 appointment and that Dr. Louis should have referred him to a retina specialist at that time. He also alleged that he sustained permanent substantial injury as a result of appellants' negligence. Finally, he asserted that R.C. 2323.43(A)(3), which places a cap on noneconomic damages, is unconstitutional as applied to Paganini personally.

{¶ 11} The case proceeded to a jury trial, and the jury awarded damages to Paganini in the amount of $1,487,500 for past and future noneconomic damages. The jury further found that Paganini's injury constituted a loss of a "bodily organ system" and a "substantial physical deformity."

{¶ 12} Before the judgment was entered, Paganini filed a motion to include in any judgment the full amount awarded for noneconomic damages. Paganini asked the court not to apply R.C. 2323.43(A)(3), which places a cap of $500,000 on noneconomic damages that may be recovered for serious injuries resulting from medical malpractice, on grounds that the statute is unconstitutional as applied to him. The court granted the motion and entered judgment in Paganini's favor for the full amount of the jury's verdict. In reaching this decision, the trial court determined that the cap on noneconomic damages in R.C. 2323.43(A)(3) violates his due course of law rights under the Ohio Const., art. I, § 16.

{¶ 13} Dr. Louis filed an immediate interlocutory appeal on April 26, 2024, pursuant to R.C. 2505.02(B)(6), which allows interlocutory appeals of judgments finding that R.C. 2323.43 is unconstitutional. Paganini filed a motion to remand the case to the trial court to allow the trial court to rule on certain post-trial motions, including Dr. Louis's motion for JNOV or, in the alternative, for a new trial. This court granted the motion for remand, and the trial court denied appellants' JNOV motion. Thereafter, appellants filed another notice of appeal, appealing the denial of their JNOV motion. The second appeal was consolidated with appellants' first appeal.

## II. Law and Analysis

### A. JNOV

{¶ 14} In the first assignment of error, appellants argue the trial court erred in denying their motion for JNOV. They argue the jury's responses to special interrogatories are not supported by Paganini's expert testimony and are, therefore, not consistent with the evidence and the general verdict. Appellants assert that Dr. John Huang testified to three separate alleged deviations from the standard of care and that the jury did not accept any of them. They further contend that the jury impermissibly invented its own standard of care and that the court should have, therefore, entered a judgment in favor of appellants.

{¶ 15} Civ.R. 49(B) governs jury verdicts and interrogatories and provides, in relevant part:

The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument.  . . . . The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

. . .

When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58.  When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.

{¶ 16} At appellants' request, the court submitted two interrogatories to the jury to test the general verdict.  Counsel did not object to the jury's responses despite the fact that the trial court specifically directed counsel to examine the interrogatories before the jury was discharged.  (Tr. 1047.)

{¶ 17} It is well-established that "a party must object to an inconsistency between an answer to a special interrogatory and a general verdict before the jury is discharged" or the issue is waived.  *Avondet v. Blankstein*, 118 Ohio App.3d 357, 368 (8th Dist. 1997) ("An objection to an inconsistent answer by a jury to an interrogatory is waived unless the party raises the objection prior to the jury's discharge."), citing *Cooper v. Metal Sales Mfg. Corp.*, 104 Ohio App.3d 34, 42 (11th Dist. 1995) ("A failure to enter a timely objection at a time when the jury has not yet been discharged has been held to be a waiver to any inconsistent answer."); *Telecom Acquisition Corp. I v. Lucic Ents.*, 2016-Ohio-1466, ¶ 45 (8th Dist.) ("The law is clear that where the inconsistencies between a general verdict and an interrogatory are

apparent before the jury is discharged, the inconsistency is waived unless a party raises an objection prior to the jury's discharge."); *Briere v. Wheeler*, 1998 Ohio App. LEXIS 3842, *4-5 (8th Dist. Aug. 20, 1998) ("A party's failure to object to alleged inconsistencies in the jury's interrogatories must, therefore, be raised while the jury is still empaneled and the trial court possesses a full range of options before it."); *Richard L. Bowen & Assocs. v. Kassouf*, 1995 Ohio App. LEXIS 2605, *9 (8th Dist. Jun. 22, 1995) ("[A] party must object to an inconsistency between an answer to a special interrogatory and a general verdict before the jury is discharged.").

{¶ 18} There are two policy rationales for this "waiver rule": (1) to promote the efficiency of trial by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different jury panel, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged. *Kassouf* at *9, citing *Greynolds v. Kurman*, 91 Ohio App.3d 389 (9th Dist. 1993); *Haehnlein v. Henry*, 41 Ohio App.3d 233, 234 (9th Dist. 1987); *see also O'Connell v. Chesapeake & O.R. Co.*, 58 Ohio St.3d 226, 229 (1990), quoting *Haehnlein* at 344 ("'The purpose of the [waiver] rule is to promote the efficiency of trials by permitting reconciliation of inconsistencies without the need for presentation of the evidence to a different trier.'").

{¶ 19} In *Haehnlein*, the court further explained that

> "[t]o allow a new trial after the objecting party failed to seek a proper remedy at the only possible time would undermine the incentives for efficient trial procedure and would allow the possible misuse of Rule 49 procedures . . . by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them."

*Haehnlein* at 234, quoting *Skillin v. Kimball*, 643 F.2d 19, 19-20 (1st Cir. 1981) (applying virtually identical federal rule).

{¶ 20} In *O'Connell*, the Ohio Supreme Court recognized an exception to the general waiver rule where the inconsistencies in the interrogatories are not apparent until after the jury has been discharged. *O'Connell* was a comparative negligence case in which the jury found that the plaintiff was 70 percent negligent, and the court entered judgment for the defendant. The plaintiff moved for JNOV after the court had excused the jury, arguing that not all the jurors who signed the interrogatory finding negligence and proximate cause signed the interrogatories apportioning fault. For example, one of the jurors did not respond to the proximate-cause interrogatory but nevertheless participated in apportioning fault between the two parties. Another juror did not respond to the interrogatory regarding whether one of the parties was negligent but nevertheless found the party 30 percent negligent in another interrogatory apportioning the percentage of fault. The jury had responded to six interrogatories, and the parties had agreed there would be no general verdict form.

{¶ 21} In addressing the inconsistencies in the jury's interrogatory responses, the court applied the general waiver rule and held that, generally, an objection to inconsistent interrogatory answers is waived unless the party raises it before the jury is discharged. *Id*. at 229. However, the court held that the plain-error doctrine applied in that particular case because the failure to apply the plain-error doctrine would have created a manifest miscarriage of justice. *Id*. at 230. In finding plain

error, the court adopted the "same-juror rule," which holds that, in comparative-negligence cases, only those jurors who find liability (i.e., breach of duty and proximate cause) may participate in the decision apportioning liability among the parties. *Id.* at 235-236. Moreover, the court concluded that the appellant in that case could not be said to have waived her challenges to the jury's answers because the inconsistencies in the jurors' responses to the interrogatories could not have been discovered "without a protracted examination and comparison of the interrogatory forms." *Id.* at 229. The inconsistencies were not readily apparent in that case.

{¶ 22} The interrogatories at issue in this case are distinguishable from those at issue in *O'Connell.* Whereas there were six jury interrogatories and no general verdict form in *O'Connell*, the issue in this case involves two interrogatories designed to test the general verdict form. The first interrogatory asked whether Dr. Louis deviated from the standard of care and, if so, to provide a narrative response explaining how he deviated from the standard of care. The second interrogatory asked the jury if, having found that Dr. Louis deviated from the standard of care, whether the deviation from the standard of care was the proximate cause of Paganini's injury. The second interrogatory further asked the jury that if it answered the interrogatory in the affirmative, to provide narrative response explaining how the deviation from the standard of care proximately caused Paganini's injury. It was immediately apparent from the jury's narrative responses that there was a potential inconsistency between the answers and the expert testimony needed to support the

general verdict because the narrative responses did not specifically restate any of the three theories of medical malpractice testified to by Paganini's expert, Dr. Huang.

{¶ 23} This problem could have been easily rectified by returning the matter to the jury for further consideration of its answers and verdict or by ordering a new trial as provided in Civ.R. 49(B). But since appellants failed to object to the interrogatory answers before the jury was excused, the parties and the court lost the opportunity to cure the alleged error by referring it for further consideration by the jury that heard the evidence presented over the course of the five-day trial. The well-established "waiver rule" requires an objecting party to raise any objection to inconsistent interrogatories before the jury is discharged or the matter is waived, save for some exceptional circumstances that are not present in this case. Therefore, appellants waived any objection to the alleged inconsistency in the interrogatory responses.

{¶ 24} Furthermore, the jury's answers to the interrogatories are reconcilable with Dr. Huang's testimony and the general verdict. Before a trial court may apply one of the options in Civ.R. 49(B), the trial court must make an effort to reconcile the general verdict and interrogatory answers whenever reasonably possible. *Woyma v. Begovic*, 1994 Ohio App. LEXIS 3124, *20 (8th Dist. July 14, 1994), citing *Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33 (1988); *see also Woodside Mgt. Co. v. Bruex*, 2020-Ohio-4039, ¶ 109 (9th Dist.), citing *Lynch v. Greenwald*, 2012-Ohio-2479, ¶ 7 (9th Dist.) ("Before applying one of the options in

Civ.R. 49(B), the trial court must determine that apparent inconsistencies between the interrogatory answers and the general verdict are irreconcilable.").

{¶ 25} "[W]here there is a view of the case that makes the jury's answers to special interrogatories consistent, it must be resolved that way before this court is free to disregard the jury's verdict and remand the case for a new trial." *Woyma* at *20, citing *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355 (1962); *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108 (1963) (construing Ohio law); *Klever v. Reid Bros. Express, Inc.*, 151 Ohio St. 467 (1949); *see also Woodside Mgt.* at ¶ 109, quoting *Gregg v. The Kroger Co.*, 1991 Ohio App. LEXIS 1829, *4 (2d Dist.) ("The trial court is tasked with 'mak[ing] every reasonable effort to reconcile' the inconsistent interrogatory answers and the general verdict.").

{¶ 26} In attempting to reconcile interrogatory answers with the general verdict, the trial court must "examine the interrogatories and answers as a whole" and "entertain all reasonable hypotheses that would reconcile the interrogatory answers and the general verdict." *Woodside Mgt.* at ¶ 109, citing *Gregg* at *4. "As the reviewing court, we must analyze all of the questions and answers in the light of the totality of the circumstances and determine whether the trial court reasonably interpreted such answers in order to reconcile them with the general verdict." (Cleaned up.) *Id.* at ¶ 110. Our review also includes construing the interrogatory answers in conjunction with the jury instructions. *Id.*, citing *Becker v. BancOne Natl. Bank*, 17 Ohio St.3d 158, 160-161 (1985).

{¶ 27} We review the trial court's efforts to reconcile interrogatory answers with the general verdict for an abuse of discretion. *Id.*, citing *Lewis v. Nease*, 2006-Ohio-4362, ¶ 48 (4th Dist.). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. This court has also held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.).

{¶ 28} In the general verdict, the jury found that appellants committed medical malpractice and awarded Paganini noneconomic damages in the amount of $1,487,500. Appellants contend the general verdict is inconsistent with the jury's responses to interrogatory Nos. 1 and 2, because they found the malpractice was due to a breakdown in communication between members of Dr. Louis's office and Dr. Louis on the morning of December 10, 2021. They contend that because Dr. Huang never criticized the failure of communication on the morning of December 10, 2021, and that his testimony focused solely on Dr. Louis's failure to recognize Paganini's eye infection during his 10:00 a.m. follow-up appointment, the jury's responses to the interrogatories conflict with the general verdict and the evidence.

{¶ 29} In response to the first interrogatory on whether Dr. Louis violated the standard of care, the jury responded that "the breakdown of communication with the Cataract Eye Center of Cleveland, et al., to Dr. Louis constitutes a deviation from the standard of care and thus delayed referral to a specialist." In response to

the second interrogatory, which asked whether deviating from the standard of care proximately caused Paganini's injuries, the jury stated, in relevant part:

> The breakdown of communication within The Cataract Eye Center of Cleveland, Inc. et al., to Dr. Louis constitutes a deviation from the standard of care. Had Dr. Louis been given more detailed information about the 6 a.m. call (no pain, no vision loss, seeing black spots) he may have been able to recognize the progression of signs/symptoms from the 6 a.m. call to the 10 a.m. appointment. (The Cataract Eye Center documented hand motion at face vision loss, increase in spots, and aching around the eye.) This, in addition to the vitreous hemorrhage, may have aided in Dr. Louis's decision to refer on 12/10/21. We also noted the rarity of the vitreous hemorrhage postcataract surgery.

{¶ 30} Dr. Huang testified that in order to properly diagnosis Paganini's condition, it was important to understand the history and progression of his symptoms. (Tr. 556-557.) Dr. Huang explained:

> And so as the physician, when we're interacting with the patient, it's critical, especially in basically a patient that has pain, where a patient has significant vision loss, in Mr. Paganini's situation, to really kind of thoroughly dig into what's going on, meaning, like, if you have a vision loss, you want to know, especially if you're talking about a patient that had surgery — the purpose of the surgery was to get the patient seeing better — and when you have a patient the next day come in with essentially significant decreased vision, really to kind of figure out what is going on, why the decreased vision is going on, and in terms of the symptoms, really try to figure out, aside from being just floaters or hemorrhage, really to figure out how quickly they appeared, is there pain associated with it, and basically really, like, do additional testing that we can do in patients where there is, you know, basically no view of the retina in the situation. So we have ultrasounds or Mr. Paganini can be referred to a specialist that has ultrasounds to assess what's going on inside the eye as well.

> So all of these things, the initial history of digging into the presentation, the pain, kind of the initial symptoms helps to basically decide whether additional tests should be done in the office or the patient should be referred.

{¶ 31} Regarding the specifics of Paganini's case, Dr. Huang testified as follows:

> Q:  Based on your education, training and experience, where we have a man who presents the day after cataract surgery where he had good vision and then he has signs and symptoms that the jury has heard about in the records and described by him which include pain, red eye, and vision loss, just taking those, in and of itself, how far below the standard of care is it for an ophthalmologist not to know that those are the red flags of possible urgent danger?
>
> . . .
>
> A:  It completely deviates from the standard of care.  It's completely below the standard.
>
> Q. Let's dig into the details of that in terms of what we know from the records and what was reported — and I would like the jury to understand from your expert testimony — we have heard testimony about spots as reported by Mr. Paganini, and then we have seen written in some of the records at the defendants' medical practice the word "floaters" being used, and I want to bring that up to show you.
>
> So at 6:38 that morning, the answering service documented that Mr. Paganini told the person on the other end of the phone call: I am seeing black spots.  And then at 8:50 — and I don't know what that writing is — 8:50 something in the morning on December 10th, the surgical center does their post-follow call: How are you doing?  I'm seeing a bunch of spots.
>
> Then when he gets to the defendant medical practice and the staff of Corrective Eye Centers, the language changes and gets put into their Exhibit 28 on their daily schedule, and someone documents: Patient having major floats.
>
> And then we have over here on Exhibit 12 the documentation from that morning that the patient is having a ton of floaters.
>
> What is your expertise in helping us to understand, to someone who has proper training, who is educated about the signs and recognizing what is there to be seen, what is the significance of spots versus floaters when it comes to recognizing what the possible condition is?

A. Sure. So, you know, like, Mr. Paganini, so like we talked about before, the vitreous floaters and what we call the posterior vitreous detachment, that liquid gel liquifying inside the eye, that's what creates the symptoms of the floaters. So naturally that gel liquifies as we age. So if you look at anybody who is young, the gel is completely solid. You look at somebody who is Mr. Paganini's age, a 90-year-old gentleman, basically the gel is pretty much completely liquified, so he already has floaters as a baseline. So it's not something that he doesn't know that there is floaters. And when you have basically now somebody with a dramatic change where somebody who knows that at a baseline they have floaters and then suddenly now there are black spots that are popping up, that tells you something is clearly different.

So the main thing is, in this kind of situation, where you have these black spots, these black spots are most likely basically, in this kind of scenario, you have to think that it could be something that's a drastic change, especially with eye pain, basically, infection going on.

{¶ 32} As this line of questioning continued, counsel asked Dr. Huang specific questions about the information Paganini provided to the afterhours answering service and to Dr. Shafran and how this information was necessary for a proper diagnosis:

Q. Can you explain [the] progression of when a patient reports at 6:30 in the morning black spots and then black spots at 8 in the morning, 8:50 something, and then by the time that they come in, they are having a ton of floats, instead of a bunch of spots, now it's a ton, how does the progression of this — is this what you taught us about the bacterial explosion that happens?

A. Right. And it's like you can imagine. If there is a progression, it certainly is more concerning for something that's much more serious and especially when we're talking about the eye in this kind of situation where the patient is losing vision, and as we kind of talked about, the bacterial multiplication inside the eye is rapid and so when things are progressing, it is much more concerning in this kind of scenario.

(Tr. 604-605.)

{¶ 33} In sum, Dr. Huang explained that in order to make a proper diagnosis, the doctor must understand the progression of symptoms, which requires knowledge of Paganini's condition over the course of the morning of December 10, 2021, including the time he called the answering service and spoke with Dr. Shafran. Dr. Louis conceded that "[y]ou got to look at the whole picture[.]" (Tr. 396.) Paganini told the answering service and Dr. Shafran that he was seeing "black spots." (Tr. 392.) Yet, Dr. Louis did not know that Paganini provided this information to his office until after the litigation commenced. (Tr. 91, 96, 105, and 410.)

{¶ 34} Dr. Huang testified that the information Paganini provided to the answering service, Dr. Shafran, and Dawson would have helped Dr. Louis in properly diagnosing Paganini with endophthalmitis, a serious eye infection that requires prompt treatment in order to save the eye. Dr. Huang further opined that where a patient presents with pain, redness, and vision loss following black spots, the standard of care requires that that the patient be referred to a specialist without delay. (Tr. 606.)

{¶ 35} When the jury interrogatories are considered in the context of Dr. Huang's testimony regarding the progression of the infection and the lack of communication about Paganini's complaints in the early morning of December 10, 2021, they are easily reconciled with Dr. Huang's testimony and the general verdict. The jury's reference to a "breakdown in communication" encompassed an implicit

finding that Dr. Louis failed to obtain all the information necessary to identify the progression of symptoms necessary for an accurate diagnosis.

{¶ 36} The interrogatory responses reflect the jury's conclusion that based on the progression of Paganini's symptoms as reported to members of Dr. Louis's office, the standard of care required Dr. Louis to promptly refer Paganini to a specialist without delay in order to treat the eye infection. The jury concluded that Dr. Louis failed to properly diagnose Paganini with the serious eye infection during the 10:00 a.m. appointment because he lacked the critical information regarding Paganini's symptoms that he reported to members of Dr. Louis's office earlier that morning. Therefore, although the interrogatory responses did not restate any of Dr. Huang's theories of liability verbatim, they are consistent with his expert opinion that Dr. Louis failed to properly diagnose Paganini's eye infection and with the general verdict finding him liable for medical malpractice.

## B. New Trial

{¶ 37} Appellants argue, in the alternative, that the trial court should have granted a new trial because of the jury's irregular responses to the special interrogatories. They contend that the inconsistency between the jury's answers to interrogatory Nos. 1 and 2 and the general verdict rendered the judgment contrary to law. They also argue that the jury's responses to interrogatory Nos. 1 and 2 are against the manifest weight of the evidence.

{¶ 38} Civ.R. 59 governs new trial and post-trial motions and provides, in relevant part, that a new trial may granted where the trial court finds:

(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

. . .

6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case; [or]

(7) The judgment is contrary to law[.]

{¶ 39} The standard of review we apply to a trial court's ruling on a Civ.R. 59 motion for a new trial depends upon the grounds for the motion. *Rigo v. Liberty Mut. Group, Inc.*, 2023-Ohio-1033, ¶ 25 (8th Dist.), citing *Robinson v. Turoczy Bonding Co.*, 2016-Ohio-7397, ¶ 23 (8th Dist.). In this case, appellants moved for a new trial pursuant to Civ.R. 59(A)(1), (4), (6), and (7). However, on appeal they only argue for a new trial based on the grounds stated in Civ.R. 59(A)(1), (6), and (7).

{¶ 40} A motion for a new trial, claiming irregularities in the proceeding or that the judgment is against the manifest weight of the evidence under Civ.R. 59(A)(1) or (6), is reviewed for an abuse of discretion. *Id.*, citing *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 2017-Ohio-1443, ¶ 12-13 (8th Dist.). As previously stated, an abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson*, 2021-Ohio-3304, at ¶ 35. An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas*, 2008-Ohio-1720, at ¶ 15.

{¶ 41} A motion for a new trial claiming the judgment is contrary to law under Civ.R. 59(A)(7) is reviewed de novo. *Riedel v. Akron Gen. Health Sys.*, 2018-Ohio-840, ¶ 13 (8th Dist.). In a de novo review, we review the merits of the case independently, without any deference to the trial court. *Sosic v. Stephen Hovancsek & Assocs., Inc.*, 2021-Ohio-2592, ¶ 21 (8th Dist.).

{¶ 42} Appellants first argue that the inconsistency between the jury's answers to interrogatory Nos. 1 and 2 and the general verdict rendered the judgment contrary to law and marred by an irregular proceeding. However, as previously discussed, the jury's interrogatory answers are easily reconciled with the expert testimony of Dr. Huang and the general verdict entering judgment in favor of Paganini. There is, therefore, no material inconsistency between the interrogatory responses and the general verdict and thus no irregularity in the proceedings.

{¶ 43} Appellants nevertheless argue that the jury's answers to interrogatory Nos. 1 and 2 are against the manifest weight of the evidence. In ruling on a motion for a new trial on the basis of manifest weight, the trial court

> "must weigh the evidence and pass upon the credibility of the witnesses, not in the substantially unlimited sense that such weight and credibility are passed on originally by the jury but in the more restricted sense of whether it appears to the trial court that manifest injustice has been done and that the verdict is against the manifest weight of the evidence."

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 27, quoting *Rohde v. Farmer*, 23 Ohio St.2d 82 (1970), paragraph three of the syllabus.

{¶ 44} In seeking a new trial based on the manifest weight of the evidence, appellants again assert that the jury rejected Dr. Huang's testimony regarding three separate alleged deviations from the standard of care and that the jury invented its own standard of care that was not based on the expert testimony. But again, as previously explained, the jury concluded, based on Dr. Huang's testimony, that the standard of care required Dr. Louis to promptly refer Paganini to a specialist without delay in order to treat the eye infection. They also implicitly concluded that Dr. Louis failed to properly diagnose Paganini with the serious eye infection during the 10:00 a.m. appointment because he lacked the critical information regarding Paganini's symptoms that he reported to members of Dr. Louis's office earlier that morning. Their conclusions are supported by Dr. Huang's testimony as set forth in our earlier discussion on appellants' claim for JNOV.

{¶ 45} Therefore, the first assignment of error is overruled.

### C. Cap on Noneconomic Damages

{¶ 46} In the second assignment of error, appellants argue the trial court erred in finding that R.C. 2323.43(A)(3), which places a cap on noneconomic damages, is unconstitutional as applied to Paganini.

{¶ 47} A party may challenge the constitutionality of a statute by asserting either a facial challenge or an as-applied challenge to the statute. *Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 26. A facial challenge asserts that there are no conceivable circumstances in which the statute would be valid. *Simpkins v. Grace Brethren Church of Delaware*, 2016-Ohio-8118, ¶ 20, citing *Arbino* at ¶ 26. An as-

applied challenge alleges that the statute is unconstitutional when applied to a plaintiff under a specific set of circumstances. *Id.*, citing *Yajnik v. Akron Dept. of Health, Housing Div.*, 2004-Ohio-357, ¶ 14, citing *Ada v. Guam Soc. of Obstetricians & Gynecologists*, 506 U.S. 1011 (1992) (Scalia, J., dissenting). A holding that a statute is unconstitutional as applied to a particular party prevents future application of the statute under the same set of circumstances, but it does not render the statute wholly inoperable. *Id.*, citing *Yajnik* at ¶ 14, citing *Ada* (Scalia, J., dissenting).

{¶ 48} The trial court found R.C. 2323.43(A)(3) unconstitutional as applied to Paganini. Appellants argue that Paganini's challenge was not "as applied" and that by treating it as an "as applied" challenge, the court employed the wrong standard of review.

{¶ 49} A party raising an as-applied constitutional challenge must prove by clear and convincing evidence that the statute is unconstitutional when applied to his or her set of particular facts. *Id.*, citing *Groch v. Gen. Motors Corp.*, 2008-Ohio-546, ¶ 181. "To prevail on a facial constitutional challenge, the challenger must prove the constitutional defect, using the highest standard of proof, which is also used in criminal cases, proof beyond a reasonable doubt." *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 2006-Ohio-5512, ¶ 21, citing *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142 (1955), paragraph one of the syllabus.

{¶ 50} Despite appellants' argument to the contrary, it is clear from Paganini's motion to include in any judgment the full amount awarded for noneconomic damages that he was making an "as applied" challenge to the statute. (*See* plaintiff's motion to include in any judgment the full amount awarded for noneconomic damages, p. 4, 8, 11, and 15.) Indeed, Paganini's argument is specific to his unusual circumstances, namely that the statute requires him to forego 66.4% of the damages awarded to him by the jury in order to lower medical-malpractice insurance rates for the public's benefit. Paganini argued in the trial court, as he does now on appeal, that the cap on noneconomic damages imposed on one of the most severely injured people is arbitrary and not reasonably calculated to obtain the legislature's objective of reducing medical-malpractice insurance premiums. Therefore, the trial court properly concluded that Paganini's argument is an "as applied" challenge to the statute.

{¶ 51} In evaluating the constitutionality of a statute, courts must remain mindful that "statutes are presumed to be constitutional and . . . courts have a duty to liberally construe statutes in order to save them from constitutional infirmities." *Eppley v. Tri-Valley Local School Dist. Bd. of Edn.*, 2009-Ohio-1970, ¶ 12, citing *Desenco, Inc. v. Akron*, 84 Ohio St.3d 535, 538 (1999).

{¶ 52} The trial court found R.C. 2323.43(A)(3) unconstitutional as applied to Paganini under the "due course of law" clause in the Ohio Const., art. I, § 16. This clause states:

> All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay.

Ohio Const., art. I, § 16. The Ohio Constitution's "due course of law" provision is equivalent to the Due Process Clause in the United States Constitution. *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544 (1941).

{¶ 53} "When reviewing a statute on due-process grounds, we apply a rational-basis test unless the statute restricts the exercise of fundamental rights." *Arbino* at ¶ 49. It is undisputed that the statute at issue here does not restrict or affect a fundamental right. Under the rational-basis test, we will uphold a statute under the due-course-of-law guarantee if (1) it bears a real and substantial relation to the public health, safety, morals, or general welfare of the public, and (2) it is not unreasonable or arbitrary. *Brandt v. Pompa*, 2022-Ohio-4525, ¶ 28, quoting *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 274 (1986), quoting *Benjamin v. Columbus*, 167 Ohio St. 103 (1957), paragraph five of the syllabus.

{¶ 54} The issue regarding the constitutionality of R.C. 2323.43(A)(3) is an issue of first impression. However, the Ohio Supreme Court has ruled on the constitutionality of similar statutes and those cases are relevant to our analysis here. For example, in *Morris v. Savoy*, 61 Ohio St.3d 684 (1991), the Court held that a $200,000 cap on general damages that could be awarded for medical malpractice was unconstitutional because it did not bear a real and substantial relation to public health or welfare and because it was unreasonable and arbitrary. *Id*. at 691. The Court explained: "'[I]t is irrational and arbitrary to impose the cost of the intended

benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice.'" *Id.*, quoting *Nervo v. Pritchard*, 1985 Ohio App. LEXIS 7986, * 8 (5th Dist. June 10, 1985).

{¶ 55} In *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451 (1999), the Ohio Supreme Court held that Am.Sub.H.B. No. 350, of the 121st Ohio General Assembly, 146 Ohio Laws, Part II, 3867 ("H.B. 350"), was unconstitutional "in toto." *Id.* at syllabus. H.B. 350 enacted several statutory provisions including R.C. 2323.54. R.C. 2323.54 placed a cap on "the amount of noneconomic damages recoverable in any tort action at the greater of $ 250,000 or three times the economic loss, to a maximum of $ 500,000; or, in the case of certain specified types of permanent injuries, at the greater of $ 1 million or $35,000 times the number of years remaining in the plaintiff's expected life." *Id.* at 487-488. The court found that H.B. 350 was unconstitutional because it violated the Ohio constitutional doctrine of separation of powers and because it violated the one-subject provision of the Ohio Const., art II, § 15(D). *Id.* at syllabus. However, with respect to the cap on noneconomic damages provided in R.C. 2323.54, the Court further found pursuant to *Morris* that "R.C. 2323.54 is invalid on due process grounds because it is unreasonable and arbitrary, irrespective of whether it bears a real and substantial relation to public health or welfare." *Id.* at 490. The Court explained:

> In addition, R.C. 2323.54 continues to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by tortious conduct. Thus, like former R.C. 2307.43,

> R.C. 2323.54 is invalid on due process grounds because it is unreasonable and arbitrary, irrespective of whether it bears a real and substantial relation to public health or welfare. *Morris*, 61 Ohio St. 3d at 691, 576 N.E.2d at 771. There is simply no constitutional difference between R.C. 2323.54 and former R.C. 2307.43. By replacing former R.C. 2307.43 with R.C. 2323.54, the General Assembly has merely expanded the scope of a statute declared unconstitutional by this court in the context of medical claims to include all tort claims, medical and otherwise.

*Id.*

{¶ 56} Although the Court later characterized this section of *Sheward* as "dicta" because it was not relevant to the ultimate holding in the case, it continued to apply the same language and reasoning in *Arbino*, 2007-Ohio-6948, ¶ 59, a case involving a broad challenge to the $250,000 cap on noneconomic damages provided in R.C. 2315.18(B)(2). In *Arbino*, the plaintiff made a facial challenge to the cap on damages under several constitutional theories. The Court rejected the plaintiff's claims that the statute violated Ohio's open courts and right-to-a-remedy guarantee, the right to a jury trial, the separation of powers, and the single-subject rule. It also held that the cap on damages in R.C. 2315.18 did not violate the plaintiff's right to due process or equal protection. In reaching these conclusions, the Court reviewed the legislative findings made when enacting the statute and found that "R.C. 2315.18 bears a real and substantial relation to the general welfare of the public." *Id*. at ¶ 55.

{¶ 57} The *Arbino* Court found that R.C. 2315.18 passed the second prong of the rational-basis test, which requires the court to determine whether the statute is arbitrary or unreasonable. In doing so, it compared R.C. 2315.18 to the statute at issue in *Morris*, stating that, in *Morris,* the Court found that the caps on damages in

that case were arbitrary and unreasonable because "they imposed the cost of the intended benefit to the public solely upon those most severely injured." *Id.*, citing *Morris*, 61 Ohio St.3d at 690-691; *Sheward*, 86 Ohio St.3d at 490. By contrast, the statute at issue in *Arbino* "alleviate[d] this concern by allowing for limitless noneconomic damages for those suffering from catastrophic injuries." *Id.* at ¶ 60.

{¶ 58} The plaintiff in *Arbino* nevertheless argued that the statute was arbitrary and unreasonable despite the exception for catastrophic injuries. *Id.* She argued "it is irrational to strike a statute for imposing the costs of a public benefit on the most severely injured, but not the 'second-most severely injured.'" The Court rejected this argument, stating:

> At some point, though, the General Assembly must be able to make a policy decision to achieve a public good. Here, it found that the benefits of noneconomic-damages limits could be obtained without limiting the recovery of individuals whose pain and suffering is traumatic, extensive, and chronic, and by setting the limits for those not as severely injured at either $ 250,000 or $ 350,000. Even Arbino acknowledges that the vast majority of noncatastrophic tort cases do not reach that level of damages. *Id. The General Assembly's decision is tailored to maximize benefits to the public while limiting damages to litigants.* The logic is neither unreasonable nor arbitrary.

(Emphasis added.) *Arbino* at ¶ 60.

{¶ 59} As previously stated, the trial court found that R.C. 2323.43(A)(3) is unconstitutional as applied to Paganini because the cap on noneconomic damages for catastrophic injuries does not have a real and substantial relationship to the general welfare. The trial court also found that the cap on noneconomic damages in R.C. 2323.43(A(3) is unreasonable and arbitrary because, as in *Morris*, it imposes

"the cost of lowering medical malpractice insurance rates on a small group of individuals with catastrophic physical injuries stemming from medical malpractice[.]"

{¶ 60} R.C. 2323.43(A) creates a two-tiered system imposing limits on the award of noneconomic damages depending on the severity of the plaintiff's injury. Under the first tier, a cap of $250,000 applies to certain types of injuries. R.C. 2323.43(A)(2). Under the second tier, the limit is increased to $500,000 if the plaintiff establishes that he or she sustained a "permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" and/or a "permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities." R.C. 2323.43(A)(3). The Ohio Supreme Court has described these kinds of injuries as "catastrophic." *Arbino*, 2007-Ohio-6948, at ¶ 59.

{¶ 61} The term "noneconomic damages" in R.C. 2323.43 refers to

nonpecuniary harm that results from an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.

R.C. 2323.43(H)(3).

{¶ 62} In enacting R.C. 2323.43, the General Assembly expressly stated that the statute was designed to "stabiliz[e] the cost of health care delivery by limiting the amount of compensatory damages representing noneconomic loss awards in

medical malpractice actions." R.C. 2323.43, Editor's notes SECTION 3(A)(3). They found, among other things, that "[t]he overall cost of health care to the consumer has been driven up by the fact that malpractice litigation causes health care providers to over prescribe, over treat, and over test their patients." The reduced risk of large noneconomic damage awards is aimed at keeping medical malpractice insurers in Ohio and thus also keeping good doctors in Ohio. Obviously, the goal of lowering medical-malpractice insurance rates is related to the general welfare of the public.

{¶ 63} However, it is not clear from the legislative findings how the cap on noneconomic damages for catastrophic injuries will have any impact in reducing malpractice insurance rates since there have been so few cases involving these types of injuries. When the General Assembly enacted R.C. 2323.43, it also provided for the ongoing study of its effects. R.C. 2323.43 was enacted in 2003 by 2001 Am.Sub.S.B. 281 ("S.B. 281"). Sections 4 and 5 of the uncodified portion of the Act created the Ohio Medical Malpractice Commission. In 2005, the General Assembly also enacted R.C. 3929.302, which requires the Ohio Department of Insurance to provide the General Assembly with an annual report summarizing Ohio medical malpractice claims.

{¶ 64} In its 2019 report, the Ohio Department of Insurance concluded that "[c]laims that went to trial were more likely to close with no indemnity payment, while those that settled or went through alternative dispute resolution were more likely to close with paid indemnity." In the same report, the commission found that

.32 percent of medical-malpractice claims result in a plaintiff's verdict. Thus, a plaintiff's decision to go to trial makes payment less likely than if the plaintiff settles the claim before trial. The 2019 report further found that there have only been 30 cases between 2005 and 2019 in which a jury returned a verdict for a plaintiff in a medical malpractice action that was in excess of the statutory caps on damages. And, the report does not show how many of these cases involved catastrophic injuries. Therefore, the legislative findings fail to demonstrate a real and substantial relationship between the capping of noneconomic damages for catastrophic injuries and malpractice insurance rates. The legislature has failed to demonstrate how capping noneconomic damages for a very small group of highly injured people, which includes Paganini, will have any impact on malpractice insurance rates beyond those provided by the cap on less severe injuries. Therefore, Paganini has overcome the presumption of constitutionality and established, by clear and convincing evidence, that applying the cap on noneconomic damages set forth in R.C. 2323.43(A)(3) to him does not bear a real and substantial relationship to medical-malpractice insurance rates.

{¶ 65} The $500,000 cap on noneconomic damages for catastrophic injuries is also arbitrary and unreasonable. As previously stated, the Court in *Morris*, 61 Ohio St.3d at 691, held "'[i]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice.'" *Id.* at 691, quoting *Nervo v. Pritchard*, 1985 Ohio App. LEXIS 7986, * 8 (5th Dist. June 10, 1985).

{¶ 66} In *Metts, II v. Nationwide Childrens Hosp.*, 2015 Ohio Misc. LEXIS 12751 (C.P. 2018), a Franklin County common pleas court found that R.C. 2323.43(A)(3) is arbitrary and unreasonable because "it contains a hard limit like the unconstitutional provision in *Morris*." *Id.* at 9. To illustrate the arbitrary nature of R.C. 2323.43(A)(3)'s cap on noneconomic damages, the court compared it to R.C. 2315.18, the statute at issue in *Arbino* that does not include a limit on noneconomic damages for catastrophic injuries. The court stated, in relevant part:

> If a man's leg were cut off by a doctor in surgery and he sought non-economic for the catastrophic injury, the damages would be limited to $500,000 under R.C. 2323.43(A)(3). Yet, if the same man were to be run over and lose his leg by the same doctor on the way home from the hospital after a successful surgery, that man could recover all non-economic damages for his catastrophic injury because R.C. 2315.18 has no additional limit. This is not reasonable or logical. The exact same injury inflicted by the same person should yield the exact same damages, but under the current statutory scheme it does not.

*Id.* at 10. The court went on to explain that this is what the *Arbino* Court was referring to when it stated that "'the benefits of noneconomic-damages limits could be obtained without limiting the recovery of individuals whose pain and suffering is traumatic, extensive, and chronic, and by setting the limits for those not as severely injured at either $250,000 or $350,000.'" *Id.*, quoting *Arbino* at 480-481. The court further observed that R.C. 2315.18 is drafted in compliance with the holding of the Supreme Court in *Morris*. *Id.* However, because R.C. 2323.43(A)(3) still burdens those most severely injured by medical malpractice in order to provide some unrealized benefit to the general public, it is arbitrary and unreasonable according to the reasoning provided in *Morris*.

{¶ 67} Therefore, Paganini has shown by clear and convincing evidence that R.C. 2323.43(A)(3)'s cap on noneconomic damages is arbitrary and unreasonable and that applying that cap to him violates his rights under the due course of law clause in the Ohio Constitution.

{¶ 68} The second assignment of error is overruled.

{¶ 69} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, A.J., and
MARY J. BOYLE, J., CONCUR