[Cite as *Fenner v. Durrani*, 2025-Ohio-4477.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| JEAN FENNER, Executor of the Estate of Juanita Jane Reeder, | : | APPEAL NO. | C-240498 |
| | | TRIAL NO. | A-1706492 |
| Plaintiff-Appellee, | : | | |
| | : | | |
| vs. | : | | |
| | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| Defendants-Appellants. | : | | |

| | | | |
|---|---|---|---|
| HEATHER SCHUSTER, Executor of the Estate of Lawrence Pridemore, | : | APPEAL NO. | C-240499 |
| | | TRIAL NO. | A-1506576 |
| Plaintiff-Appellee, | : | | |
| | : | | |
| vs. | : | *JUDGMENT ENTRY* |
| | : | | |
| ABUBAKAR ATIQ DURRANI, M.D., | : | | |
| and | : | | |
| | : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, | : | | |
| Defendants-Appellants. | : | | |

This cause wase heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed in part and reversed in part, and this cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed 70% to appellants and 30% to appellees.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 9/26/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *Fenner v. Durrani*, 2025-Ohio-4477.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JEAN FENNER, Executor of the Estate of Juanita Jane Reeder, : | APPEAL NO. | C-240498 |
| | TRIAL NO. | A-1706492 |
| Plaintiff-Appellee, : | | |
| : | | |
| vs. : | | |
| : | | |
| ABUBAKAR ATIQ DURRANI, M.D., : | | |
| : | | |
| and : | | |
| : | | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, : | | |
| Defendants-Appellants. : | | |

| | | |
|---|---|---|
| HEATHER SCHUSTER, Executor of the Estate of Lawrence Pridemore, : | APPEAL NO. | C-240499 |
| | TRIAL NO. | A-1506576 |
| Plaintiff-Appellee, : | | |
| : | | |
| vs. : | *O P I N I O N* |
| : | |
| ABUBAKAR ATIQ DURRANI, M.D., : | |
| : | |
| and : | |
| : | |
| CENTER FOR ADVANCED SPINE TECHNOLOGIES, : | |
| Defendants-Appellants. : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: September 26, 2025

*Statman Harris, LLC*, and *Alan J. Statman* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister, LLP*, *Philip D. Williamson, Aaron M. Herzig, Russell S. Sayre*, and *Nathan R. Coyne*, for Defendants-Appellants.

**CROUSE, Judge.**

**{¶1}** Defendants-appellants Dr. Abubakar Atiq Durrani and the Center for Advanced Spine Technologies, Inc., ("CAST") (collectively referred to as "Appellants") appeal from the trial court's judgments entered in favor of plaintiffs-appellees Jean Fenner, Executor of the Estate of Juanita Jane Reeder, and Heather Schuster, Executor of the Estate of Lawrence Pridemore (collectively referred to as "Appellees").[1] The judgments were entered following jury verdicts in favor of Appellees on various claims related to their allegations that Durrani had performed medically unnecessary surgeries on Reeder and Pridemore.

**{¶2}** Appellants have raised three assignments of error for our review. In the first assignment of error, they argue that the trial court erred in consolidating Appellees' cases for trial. In the second assignment of error, they challenge the trial court's denial of their motions for a judgment notwithstanding the verdict ("JNOV") or a new trial. They contend that the motions should have been granted because the trial court improperly permitted one of Appellees' experts to testify when he did not meet the active-clinical-practice standard required by Evid.R. 601(B)(5)(b) and that the trial court improperly instructed the jury on Durrani's absence. Recent precedent from this court, specifically *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), and *Courtney v. Durrani*, 2025-Ohio-2335 (1st Dist.), held these same arguments to be without merit. On the authority of *Jones* and *Courtney*, we find no error in the trial court's consolidation of Appellees' cases for trial and denial of Appellants' motions for JNOV or a new trial.

**{¶3}** In the third assignment of error, Appellants raise various challenges to

---

[1] We sua sponte consolidate these separate appeals into a single opinion and judgment because the cases were tried together and the parties raise identical arguments in both appeals.

the trial court's monetary awards to both Fenner and Schuster, including its awards of prejudgment interest and damages for past medical expenses, as well as its decision to deny Appellants a setoff. We find no error in the trial court's award of prejudgment interest or in its determination that Appellees were not entitled to receive the jury's awards of past medical expenses until adequate releases were obtained guaranteeing that Appellants would not be subject to a double recovery from Appellees' insurance companies. But we hold that pursuant to R.C. 2307.28, Appellants were entitled to a setoff based on Appellees' settlement with West Chester Hospital and UC Health and that the trial court erred in finding otherwise.

{¶4} For the reasons discussed below, the trial court's judgments are accordingly affirmed in part and reversed in part, and this cause is remanded.

## I. Factual and Procedural History

{¶5} On December 3, 2015, Pridemore filed suit against Durrani, CAST, West Chester Hospital, LLC, and UC Health. The complaint asserted claims for negligence, battery, failure to obtain informed consent, intentional infliction of emotional distress, fraud, and spoliation of evidence against Durrani. It asserted claims for vicarious liability, negligent hiring, retention, and supervision, fraud, a violation of the Ohio Consumer Sales Protection Act, and spoliation of evidence against CAST.[2] A complaint alleging nearly identical claims was filed by Reeder against the same defendants on August 15, 2016.

{¶6} Both complaints generally alleged that Durrani had fraudulently induced Pridemore and Reeder to undergo unnecessary medical procedures by

---

[2] It is not necessary to discuss the specific claims asserted against West Chester Hospital, LLC, and UC Health because the parties reached a settlement and the claims against those entities were dismissed prior to trial.

6

exaggerating the findings on their medical images. They alleged that these surgeries were improperly performed, caused them harm, and did not result in the promised relief. Both Pridemore and Reeder passed away while the actions were pending. Fenner was substituted as plaintiff for Reeder, and Schuster was substituted as plaintiff for Pridemore.

{¶7} Over Appellants' objection, Appellees' claims against Durrani and CAST were joined for trial.

{¶8} In February of 2020, Schuster filed a motion to join her insurers to the action because of their interest as subrogees stemming from their payment of her medical expenses. The trial court ordered that Schuster's insurers "should be joined as parties plaintiff to this action under Civ.R. 19(A)(3) and 21." Despite the trial court's order, the insurance companies were never joined in the action. Relatedly, while these cases were pending, the trial court issued several orders in various cases that had been brought against Durrani, including Fenner's and Schuster's, requiring all plaintiffs to join the necessary parties with respect to past medical expenses.

{¶9} On the first morning of trial, prior to voir dire, Appellants made an oral motion to preclude Appellees from putting on evidence of a claim for past medical expenses, arguing that the health insurers that had paid those expenses were the real parties in interest and had not been joined in the actions. In the alternative, they requested a continuance so that the insurers could be joined. The trial court denied the motion, stating that if past medical expenses were to be awarded to Appellees, it would retain the awards until the insurers released any claims to Appellees.

{¶10} Appellants also objected to the trial court's intention to provide a "missing witness instruction" to the jury regarding Durrani's absence at trial. The trial court overruled the objection and stated that it believed the instruction was

appropriate.

### A. Trial Testimony

{¶11} The evidence presented at a jury trial established that Reeder was referred to Durrani by her primary care physician. The intake form submitted by Reeder prior to her first visit with Durrani indicated that she suffered extreme pain in her lower back that radiated into her hips, legs, and toes, as well as pain in her arms. The form further indicated that Reeder had experienced these symptoms for many years, that they had worsened over the last two years, that her pain was aggravated by standing, walking, and bending forward, and that Reeder struggled with tasks such as lifting, shopping, writing, household chores, and yard work. Prior to seeing Durrani, Reeder had attempted many nonsurgical interventions to treat her pain, including physical therapy, chiropractic care, and steroid injections.

{¶12} The evidence established that Durrani sent a letter to Reeder's referring physician setting forth impressions that he had reached about Reeder's condition after examining her and reviewing her medical images. The letter indicated that, in Durrani's opinion, Reeder suffered from (1) lumbar spinal stenosis associated with lumbar spondylolisthesis at the L4-L5 level, (2) progressive and severe symptoms of neurogenic claudication, (3) back pain with radicular pain in the L4 and L5 distribution, (4) very significant functional impairment, (5) anterolisthesis of L4 on L5, and (6) bilateral severe central stenosis and bilateral severe foraminal stenosis at the L4-L5 level. The letter additionally stated that Reeder had unsuccessfully attempted conservative treatment for over three years.

{¶13} With respect to Pridemore, the evidence established that he was also referred to Durrani by his primary care physician for lower back pain and uncontrollable muscle jerking. The intake form that Pridemore submitted prior to

seeing Durrani indicated that he suffered low- and middle-back pain. The form was inconsistent as to the amount of time that Pridemore had experienced this pain, stating both that his pain had "just started," but also that he had experienced the pain for two to three years. The form further indicated that activities such as bending over and walking for long periods of time aggravated Pridemore's pain, and that Pridemore needed assistance with tasks such as walking, cooking, and yardwork. It also provided that Pridemore had previously experienced temporary relief from medication and muscle relaxers.

{¶14} As he had with Reeder, Durrani sent a letter to Pridemore's referring physician setting forth the impressions that he had reached after examining Pridemore and reviewing his medical images. The letter indicated that Pridemore suffered from (1) lumbar spinal stenosis associated with lumbar spondylolisthesis at the level of L5 on S1, (2) back pain with radicular pain in the L4 and the L5 distribution on the right side, (3) severe symptoms of neurogenic claudication, (4) very severe functional impairment, (5) anterolisthesis of L5 on S1, (6) central stenosis at the L5-S1 level, (7) predominantly right-sided lateral recess stenosis at the L5-S1 level, (8) central stenosis at the L4-L5 level, (9) predominately right-sided foraminal stenosis at the L4-L5 level, and (10) right-sided L4 and L5 radiculopathy. The letter also stated that Pridemore had unsuccessfully attempted conservative treatment for many months/years.

{¶15} The evidence presented at trial established that both Reeder and Pridemore elected to undergo surgeries recommended by Durrani, and that Durrani performed a lumbar fusion on Pridemore at the L5-S1 level and a lumbar laminectomy and bilateral foraminotomy on Reeder.[3]

---

[3] Durrani also performed separate cervical procedures on both Reeder and Pridemore, but the respective complaints do not allege any claims regarding those procedures.

9

{¶16}   Appellees presented testimony from three expert witnesses in support of their claims that Durrani performed medically unnecessary surgeries—Dr. Stephen Bloomfield, Dr. Keith Wilkey, and Dr. Ranjiv Saini. Appellants objected to the testimony of Dr. Wilkey, arguing that he did not engage in the active clinical practice of medicine or its teaching at least 50 percent of the time, as is required by Evid.R. 601(B). In support of their objection, Appellants contended that, at the time of trial, Dr. Wilkey was not seeing patients clinically or performing surgeries. The trial court permitted Dr. Wilkey to testify. It noted that the purpose of Evid.R. 601(B) was "to prevent a person who is not engaged in the active practice of medicine from hiring out as a hired gun on a consistent basis." And it stated that Dr. Wilkey "gave the certificate that was required," had evaluated this case while he was actively practicing, and that, but for the pandemic, the trial would have occurred and his testimony would have been offered while he was in compliance with the rule.

{¶17}   Drs. Bloomfield, Wilkey, and Saini collectively testified that Durrani had breached the applicable standard of care in his interpretation of Reeder's and Pridemore's medical images, had exaggerated the findings on those images to obtain insurance coverage for surgery and to convince them to undergo surgery, and had recommended and performed surgeries that were not medically necessary.

{¶18}   Each doctor additionally opined that the informed-consent forms signed by Reeder and Pridemore were not adequate and breached the standard of care. They testified that Durrani improperly used abbreviations to describe the surgeries to be performed and that the forms failed to address the risks and benefits and pros and cons of the respective surgeries. Dr. Wilkey further testified that informed consent can never be provided for a surgery that is not medically indicated.

{¶19}   Drs. Bloomfield, Wilkey, and Saini further testified that the unnecessary

surgeries performed by Durrani caused both Reeder and Pridemore to suffer permanent scarring and additional pain.

{¶20} Fenner testified that Reeder was her sister, and that Reeder's pain was such that she could hardly walk prior to her surgery. As a result, she seldom desired to leave her home. According to Fenner, Reeder had no improvement after the surgery, continued to have difficulty getting around, and treated with pain-management doctors.

{¶21} Schuster testified that Pridemore was her father, and that prior to his surgery, he suffered from spastic jerking motions and walked with a cane. She testified that, post-surgery, Pridemore continued to suffer from the spastic movements and that she saw no improvement in his condition before his death.

{¶22} At the close of Appellees' presentation of evidence, Appellants moved for a directed verdict. As relevant to these appeals, they argued that they were entitled to a judgment that Appellees were not entitled to recover past medical expenses because they had failed to join their health-care insurers, which were the real parties in interest concerning these damages. The trial court denied the motion.

{¶23} In their defense, Appellants presented testimony from three expert witnesses. Collectively, Dr. Derk Purcell, Dr. Mario Ammirati, and Dr. Paul Kaloostian testified that Durrani's interpretations of Reeder's and Pridemore's medical images were reasonable and within the standard of care. They opined that Durrani did not exaggerate the radiographic findings on the images to fraudulently induce Reeder and Pridemore to undergo surgeries that were not medically indicated.

{¶24} Dr. Ammirati specifically testified that the procedure performed on Reeder was medically indicated based on her medical images and her presentation to Durrani. Contrary to Fenner's testimony about Reeder's lack of improvement after the

surgery, he testified that Reeder's medical records indicated that her pain was significantly alleviated by the surgery.

{¶25} Similarly, Dr. Kaloostian testified the procedure performed on Pridemore was medically indicated based upon Pridemore's physical condition upon presenting to Durrani. He further testified that Pridemore benefited from, and improved following, the surgery, and that no other conservative treatments would have helped him. Contrary to Shuster's testimony about Pridemore's lack of improvement after the surgery, Dr. Kaloostian testified that Pridemore's records indicated that he had discontinued his use of opioids post-surgery and had stated post-surgery that he felt the best he had felt in a long time.

{¶26} Dr. Ammirati and Dr. Kaloostian also testified that the informed-consent forms used by Durrani were adequate. Dr. Kaloostian stated that it was not necessary for a physician to spell out the name of the procedure to be performed and that it was acceptable to use abbreviations to identify a procedure.

{¶27} At the close of evidence, Appellants renewed their motion for a directed verdict on the issue of past medical expenses. They also moved for a directed verdict on the issue of whether Appellees had suffered catastrophic losses. The motion was again denied.

### B. Jury Verdicts

{¶28} The jury returned verdicts in favor of Appellees on all counts. It found that Durrani was negligent in his treatment of both patients, that he failed to acquire informed consent from both patients, that he committed battery on both patients, and that he fraudulently misrepresented to both Pridemore and Reeder that their respective surgeries were necessary.

{¶29} The jury awarded Schuster $44,483 for past medical expenses and

$50,000 for pain and suffering. The jury awarded Fenner $38,519.04 for past medical expenses and $65,000 for pain and suffering. The jury additionally awarded both Appellees $2,500,000 in punitive damages.

### C. Post-Trial Motions

{¶30} Appellants filed motions for a JNOV or a new trial, arguing, as relevant to these appeals, that the trial court erred by permitting Appellees to pursue a claim for past medical expenses at trial, that the trial court erred by giving the jury a missing-witness instruction on Durrani's absence, and that they were entitled to a remittitur of the punitive damages awards under R.C. 2315.21. Appellants also filed post-trial motions for a setoff. They argued that they were entitled to a setoff in damages for any amount that Appellees may have received from other entities, including West Chester Hospital and UC Health.

{¶31} Appellees filed motions for prejudgment interest and also moved for a hearing on those motions.

{¶32} On January 6, 2023, the trial court issued decisions on Appellants' post-trial motions. On the issue of past medical expenses, the trial court found that Appellees' insurers were the real parties in interest as to the claims for those expenses. To avoid any prejudice to Appellants and prevent a double recovery, the trial court held that Appellees could not receive the awards of past medical expenses (to which the insurers had a right of subrogation) until they obtained an adequate release. The lower court also held that it had not abused its discretion in providing the jury instruction on Durrani's absence.

{¶33} When ruling on the request for a setoff, the trial court relied on this court's decision in *Adams v. Durrani*, 2022-Ohio-60 (1st Dist.). It explained that *Adams* held that intentional tortfeasors are not entitled to a setoff. It then held that

Appellants were not entitled to a setoff because Appellees' injuries had been caused by both intentional and unintentional torts and the injuries caused by both types of torts could not be distinguished.

{¶34} Last, the trial court found that Appellants were entitled to a reduction of the awards for punitive damages. Pursuant to R.C. 2315.21(D)(2)(b), it accordingly reduced Schuster's award of punitive damages to $188,966 and Fenner's award of punitive damages to $207,038.

{¶35} In August of 2023, Appellants filed supplemental memorandums in support of their motions for a JNOV or a new trial. The memorandums noted that the trial court had not yet issued a final appealable order in these cases, and it asked the court to review three recent First District cases that it contended may impact the trial court's rulings on the post-trial motions.

{¶36} On March 21, 2024, Appellants filed supplements to their motions for a setoff. The supplemental motions argued that the First District's precedent on the issue of a setoff had been called into question by a Federal District Court case, *Gorsha v. Clark*, 2022 U.S. Dist. LEXIS 16485 (S.D. Ohio Jan. 31, 2022).

{¶37} On April 22, 2024, the trial court issued follow-up decisions on the parties' post-trial motions. It rejected Appellants' supplemental arguments on the issues of the jury instruction and a setoff. When ruling on the supplemental arguments concerning the request for a setoff, the court stated, "Whatever the merits of defendants' argument are with respect to this issue, this Court is obligated to follow the First District's current law that governs the matter until it is reversed on appeal."

{¶38} On the issue of past medical expenses, the trial court issued different rulings with respect to each plaintiff. It first noted its earlier ruling that past medical expenses were not to be paid until adequate releases were obtained. With respect to

Fenner, the lower court explained that Fenner's counsel had represented to the court that Medicare and Anthem had been paid, and it held that "the $38,519.04 that the jury awarded to Plaintiff for past medical expenses will be paid to Plaintiff, and there is no longer any need for Plaintiff to obtain a release from Defendants as to this amount."

**{¶39}** With respect to Schuster, the trial court explained that it had been informed that Medicare's lien of $2,693 had been paid and that "UMR Optum had waived their lien." It further noted that it had received no information as to whether United Healthcare's lien of $74,836.54 had been paid, and that this lien, by itself, was "more than $30,000 [greater] than the jury's $44,483 award to Plaintiff for past medical expenses." The court then reiterated its earlier order that Schuster should not be paid the jury's award of $44,483 without the necessary release.

**{¶40}** The trial court's April 2024 decisions also addressed Appellees' motions for prejudgment interest. It found that an award of prejudgment interest was appropriate because the record contained no evidence that Appellants conducted an individual analysis of either plaintiff's case. It further held that Appellants had not made good-faith efforts to settle the cases, and that Appellees had not failed to make such efforts.

**{¶41}** After issuing the April entries, the trial court subsequently revisited the issue of prejudgment interest in response to this court's holding in *Jones*, 2024-Ohio-1776 (1st Dist.), in which we reversed a trial court's award of prejudgment interest where no "evidence" was admitted at the hearing or submitted with the relevant motions. On June 17, 2024, the trial court held a hearing on the motions for prejudgment interest and again held that Appellees were entitled to an award of prejudgment interest.

**{¶42}** The trial court issued a final, appealable order in both cases on July 25, 2024. These orders set forth the total damages each Appellee was to receive, including compensatory damages, punitive damages, attorney fees, and prejudgment interest. Appellants have appealed.

## II. Joint Trial

**{¶43}** In their first assignment of error, Appellants argue that the trial court erred in conducting a multi-plaintiff trial and that it should have ordered new trials with single plaintiffs.

**{¶44}** Pursuant to Civ.R. 42(A)(1)(a), a trial court may consolidate more than one action if the actions "involve a common question of law or fact." The common questions in each action "need not be identical," and Civ.R. 42 "does not take into account whether the joined actions have separate components or raise distinct factual or legal issues." *Courtney*, 2025-Ohio-2335, at ¶ 48 (1st Dist.). In determining whether consolidation is appropriate, Civ.R. 42 does not require the trial court to weigh the similarities in the actions against their differences, and "by the plain terms of the rule, a simple common question of law or fact is enough to support a joint trial." *Id.*

**{¶45}** Prejudice is also a relevant consideration to a consolidation analysis under Civ.R. 42. *Id.* at ¶ 57. While "any consolidation of trials will certainly result in some prejudice," we have held that "the mere fact that a defendant can articulate some degree of prejudice flowing from Civ.R. 42(A) consolidation is insufficient to undermine consolidation." *Id.* Unfair prejudice must be demonstrated by the party opposing consolidation. *Id.*[4]

---

[4] The concurring opinion takes issue with *Courtney's* use of the term "unfair prejudice," contending that the proper analysis when reviewing for prejudice in the context of consolidation is for this court to "not only weigh the prejudicial effect of [the joinder] but also determine that, if [the joinder] had not occurred, the jury . . . would probably have made the same decision." It seems that both the

**{¶46}** A trial court's decision to consolidate actions under Civ.R. 42 is reviewed for an abuse of discretion. *Jones*, 2024-Ohio-1776, at ¶ 20 (1st Dist.). "The term 'abuse of discretion' implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Garry v. Borger*, 2023-Ohio-905, ¶ 14 (1st Dist.), citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

**{¶47}** We were recently confronted with similar challenges to the trial court's consolidation of actions against Appellants for trial in *Jones* and *Courtney*. In both cases, we held the challenges to be without merit. The *Jones* court held that joinder was appropriate because the consolidated actions each involved common questions of fact regarding the L5-S1 area of the spine and each case presented the same claims against the same defendants and was "based on the same theory of malpractice and/or fraud surrounding these conditions." *Jones* at ¶ 25. We also noted that the trial court had instructed the jury that each case should be considered on its own merit, and that we presumed the jury followed that instruction. *Id.* at ¶ 26.

**{¶48}** In *Courtney*, we found no abuse of discretion in the trial court's consolidation of two plaintiffs' actions for trial where the plaintiffs "had similar diagnoses and received essentially the same surgery," "both advanced claims that Durrani made medically incorrect impressions of their images to order and perform

---

concurring opinion and *Courtney* agree that there is a prejudice analysis involved in determining whether trials were properly joined. And such analysis requires examining whether the joinder affected the jury's decision. *See, e.g., Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001) ("Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision."). Other courts that have considered whether joinder is proper under Civ.R. 42 have used the term "unfair prejudice." *See, e.g., Morehead v. Petersen*, 2024 U.S. Dist. LEXIS 153917, *3 (W.D. Ark. Aug. 27, 2024) ("Therefore, even if common questions of law and fact are present, consolidation is inappropriate if it leads to inefficiency, inconvenience, or unfair prejudice to a party." [Cleaned up]); *Molesky v. State Collection & Recovery Servs., LLC*, 2013 U.S. Dist. LEXIS 97951, *4 (N.D. Ohio July 12, 2013) ("Consolidation is not warranted where it leads to inefficiency, inconvenience, or unfair prejudice to a party." [Cleaned up]); *Equal Emp. Opportunity Comm. v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998) ("Consolidation is inappropriate, however, if it leads to inefficiency, inconvenience, or unfair prejudice to a party."); *Hart v. J.H. Baxter & Co., Inc.*, 2021 U.S. Dist. LEXIS 270823, *5 (E.D. Or. Nov. 4, 2021) (same).

surgeries that were not necessary," and both explained through identical expert testimony "how the spine functions, the complexities of their conditions, and the surgeries Durrani performed." *Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.).

**{¶49}** In the case at bar, we similarly hold that there was no abuse of discretion in the trial court's consolidation of Fenner's and Schuster's cases for trial, as the two cases shared common questions of both law and fact. Each plaintiff asserted the same causes of action against the same defendants, and those causes of action were based on allegations that Durrani exaggerated the findings on Reeder's and Pridemore's medical images to fraudulently induce them to undergo surgeries that were not medically necessary. As in *Courtney*, Appellees presented expert testimony relevant to each of their cases about how the spine functions and the complexities of their conditions. *See id.* And while the surgeries performed were not identical, each case involved a discussion of the impressions that were made by Durrani concerning both patients' spines. Many of those impressions overlapped, including, for example, stenosis, spondylolisthesis, anterolisthesis, and neurogenic claudication.

**{¶50}** Appellants contend that they were prejudiced by the consolidation of Appellees' cases for trial. But prior to consolidation, Appellants advanced only a general objection to, and prejudice argument concerning, consolidation. They first did so in response to the initial motion for group trials filed by numerous plaintiffs that had asserted causes of action against Durrani and CAST. Then, prior to trial, Appellants noted a continuing objection to group trials. Defense counsel stated, "I just wanted to reiterate our objections to the trials being tried together, the plaintiffs being tried together." Defense counsel argued that "[i]t's evidence of other acts" and that "[i]t's unfair and prejudicial to the defense." No specific arguments were made with respect to the consolidation of Fenner's and Schuster's cases or how joinder of *these*

*two specific cases* was prejudicial.

**{¶51}** Appellants argue for the first time on appeal two specific examples of prejudice. They first argue that it was prejudicial for the jury to hear testimony that Durrani failed to sign off on his dictated notes regarding Pridemore's surgery for approximately eight months, when such evidence would not have been otherwise admissible in Reeder's case. And they also argue that it was prejudicial for the jury to hear about a note in Reeder's medical records that she "unfortunately had lumbar disc surgery with Dr. Durrani."

**{¶52}** We agree with Appellants' assertion that the evidence pertaining to Pridemore's surgery likely would not have been admitted in Reeder's trial absent consolidation, and vice versa for the evidence concerning Reeder's medical records. But, as we noted in *Courtney*, "any consolidation of trials will certainly result in some prejudice." *Courtney*, 2025-Ohio-2335, at ¶ 57 (1st Dist.). It is *unfair prejudice* that weighs against consolidation, *id.*, and we hold that Appellants have not established that introduction of these two pieces of evidence resulted in unfair prejudice. The trial court instructed the jury in this case that each plaintiff's case must be considered on its merits. Not only do we presume the jury followed that instruction, *see Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.), but the record contains no evidence that the jury considered evidence relevant to only one plaintiff's case when deciding the other's. *See Courtney* at ¶ 58.

**{¶53}** In support of their prejudice argument, Appellants argue that the jury awarded both Fenner and Schuster identical punitive damages, establishing that the jury failed to view their cases separately. We found this argument to without merit in *Courtney*, holding that the imposition of identical punitive damages awards did not establish prejudice because "'the purpose of punitive damages are to punish the

tortfeasor and to deter similar conduct.'" *Id.*, quoting *Whetstone v. Binner*, 2016-Ohio-1006, ¶ 15. For this same reason, the jury's award of identical punitive damages in the underlying cases does not establish unfair prejudice. If the jury determined that a punitive damages award of $2,500,000 was necessary to punish Durrani and deter similar conduct in the future, it would naturally award that same amount to each plaintiff.

{¶54} Appellants last argue that *Jones* was wrongly decided and ask us to overrule it. They contend that we erred in *Jones* by conducting our own Civ.R. 42(A) analysis when the trial court had not made findings to demonstrate that the requirements of Civ.R. 42(A) were satisfied before consolidating the two cases. But Appellants have cited no cases requiring the trial court to make findings pursuant to Civ.R. 42(A) before consolidating actions, and the language of the rule itself does not require the trial court to make findings.[5] While it would certainly be helpful and allow for a more meaningful review if a trial court set forth its findings in support of the consolidation of multiple actions, the trial court's failure to do so does not prohibit our review of the consolidation.

{¶55} Appellants also contend that *Jones* causes significant problems for medical-malpractice claims at large. We considered and rejected this same argument in *Courtney*. *See Courtney*, 2025-Ohio-2335, at ¶ 50-52 (1st Dist.) ("Unless or until

---

[5] Appellants cite to this court's entry in *State ex rel. Durrani v. Reece*, No. C-220278 (1st Dist. Aug. 26, 2022), in which we granted a motion to dismiss a petition for writs of mandamus and prohibition filed by relators Durrani and CAST. In that entry, we stated "our review of the record failed to reveal the basis for the trial court's conclusions that common questions of law or fact exist under Civ.R. 42(A)," "[t]he duty is on the trial court to determine common issues in each case to be consolidated," and "[t]he language of Civ.R. 42 necessarily makes the finding of commonality in each action a prerequisite to consolidation." This language was dicta. Despite our discussion of consolidation under Civ.R. 42, our holding concerned mandamus law. We ultimately held that relators had an adequate remedy at law and that mandamus was not the proper vehicle to address their concerns.

Civ.R. 42(A) is amended to exclude medical claims against physicians from its joinder provision, we are duty-bound to follow it."). We therefore decline to overrule *Jones.*

**{¶56}** We accordingly hold that the trial court did not abuse its discretion in consolidating Fenner's and Schuster's cases for trial. The first assignment of error is overruled.

### III. Motions for JNOV or a New Trial

**{¶57}** In their second assignment of error, Appellants argue that the trial court erred in denying their motions for a JNOV or a new trial. They argue that the trial court improperly permitted Dr. Wilkey to testify and that the trial court improperly instructed the jury on Durrani's absence.

**{¶58}** We review de novo a trial court's ruling on a Civ.R. 50 JNOV motion. *Courtney*, 2025-Ohio-2335, at ¶ 61 (1st Dist.). In doing so, we must view the evidence presented in the light most favorable to the nonmoving party. A Civ.R. 50 motion challenges the sufficiency of the evidence, and it should not be granted unless reasonable minds can only reach one conclusion and that conclusion is in favor of the moving party. *Id.*

**{¶59}** In contrast, a motion for a new trial, as we recently explained in *Ravenscraft v. Durrani,* 2025-Ohio-2900, ¶ 95 (1st Dist.), may be granted for a variety of reasons, and the scope of our review is dependent upon the argument advanced in the motion. Where the trial court's exercise of its discretionary authority is challenged, we employ a typical abuse-of-discretion standard of review. But where the motion for a new trial raises a legal issue, we conduct a de novo review. *Id.*

### A. Dr. Wilkey's Testimony

**{¶60}** Appellants argue that the trial court improperly permitted Dr. Wilkey to testify because he was not in compliance with Evid.R. 601(B)(5)(b)'s requirement that

21

he devote at least half of his professional time to the active clinical practice of medicine or to its instruction. They contend that, at the start of trial, Dr. Wilkey devoted less than 50 percent of his time to clinical work.

{¶61} Dr. Wilkey's testimony established that throughout the course of his career, until the COVID pandemic, he spent more than 50 percent of his time in the active clinical pursuit of his orthopedic spine surgery career. But Dr. Wilkey testified that once the pandemic struck, elective operations like those he performed ceased, and he left his employment as a spine surgeon. At the time of trial, Dr. Wilkey was employed by a health care company in a utilization management role.

{¶62} The trial court allowed Dr. Wilkey to testify over Defendants' objection. It stated,

> The research that I got and review[ed], basically I looked at the purpose of the rule. The purpose of 601[B] is to prevent a person who is not engaged in the active practice of medicine from hiring out as a hired gun on a consistent basis. Based upon the facts inherent in these cases, that's not the case.
>
> Dr. Wilkey, I think, gave the certificate that was required, which means that he had evaluated this case while he was actively practicing, but for the virus, that delayed everything for over a year this case would have been scheduled and held while he was actively engaged in the practice of medicine. Therefore, the Court sees no reason why given the intent of 601[B], and also the circumstances that were superimposed upon all cases why this doctor cannot go ahead and render an opinion that the jury should listen to and evaluate and make a decision with respect to whether Dr. Durrani met the standard of care or not.

22

**{¶63}** This same argument concerning Dr. Wilkey's compliance with Evid.R. 601(B)(5)(b) was raised and rejected in *Courtney*. We first explained in *Courtney* that "[t]he version of Evid.R. 601(B)(5)(b) in place as of Courtney and Koelblin's September 8, 2021 trial measured Dr. Wilkey's compliance with this standard at the time of trial." *Courtney*, 2025-Ohio-2335, at ¶ 69 (1st Dist.), citing Evid.R. 601 (B)(5)(b) (effective July 1, 2021). We noted that, at the time of trial, Dr. Wilkey worked for an insurance company and provided no direct patient care, but that, prior to the pandemic, when Courtney's and Koelblin's complaints were filed, Dr. Wilkey spent 90 to 95 percent of his time operating on patients in a clinical setting. *Id.*

**{¶64}** We then explained that Evid.R. 601 was amended in July of 2023, and that the amended rule assessed a testifying expert's compliance with the active-clinical-practice requirement "'at either the time the negligent act is alleged to have occurred or the date the claim accrued.'" *Id.* at ¶ 72, quoting Evid.R. 601(B)(5)(b) (effective July 1, 2023). We held that under the amended rule, an expert was permitted to testify "based on their professional practice as of the time of the alleged medical negligence, not as of the time of trial." *Id.*

**{¶65}** *Courtney* recognized that the merits of Appellants' argument regarding Dr. Wilkey's qualifications to testify as an expert hinged on which version of the evidentiary rule was to be applied. *Id.* at ¶ 73. We resolved that question by looking at Evid.R. 1102, *id.* at ¶ 74, which provided that the amended rules would "govern all further proceedings in actions then pending, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies." Evid.R. 1102. Pursuant to Evid.R. 1102, *Courtney* applied amended Evid.R. 601(B)(5)(b) and held that the trial court did not err in permitting Dr. Wilkey to testify. *Courtney* at ¶ 74.

23

**{¶66}** Recently, in *Ravenscraft*, 2025-Ohio-2900, ¶ 113-114 (1st Dist.), we elaborated on why it was appropriate to apply the amended rule. Noting that the amendments applied to all "all further proceedings in actions then pending," we stated that "an action [] is pending from its inception until the rendition of final judgment." (Cleaned up.) *Id.* at ¶ 113. Because the amended rule took effect while post-trial motions were pending, we held in *Ravenscraft* that the amended rule applied. *Id.* at ¶ 115.

**{¶67}** We follow *Courtney* and *Ravenscraft* and apply amended Evid.R. 601(B)(5)(b) to reach the same conclusion with respect to Dr. Wilkey's testimony in Fenner's and Schuster's cases.[6] Under the amended rule, at the time of Durrani's alleged medical negligence, Dr. Wilkey met the active-clinical-practice requirement. Applying the amended rule is appropriate here because, as in *Ravenscraft,* the amended rule took effect while post-trial motions were pending and before the trial court had entered a final judgment in the actions. Further, these appeals were filed in August of 2024, over a year after the amended rule took effect, and the actions were still pending during the appellate process. *Ravenscraft* at ¶ 116, quoting *Black's Law Dictionary* (8th Ed. 2004) (an appeal is "'[a] proceeding undertaken to have a decision reconsidered by a higher authority'"); *See also Maynard v. Eaton Corp.*, 2008-Ohio-4542, ¶ 13-14 (discussing when an action is pending and holding that "a matter would be 'pending' when it is on appeal and a decision on the disputed issues by the court is anticipated"). Applying the amended rule in these appeals is not infeasible and would

---

[6] In a footnote of their appellate brief, Appellants acknowledge that Evid.R. 601(B) was amended, but state that the amended rule is not applicable because the trial in this case occurred prior to the amendment. *Courtney*, which we are bound to follow and in which we reached the opposite conclusion about the application of the amended rule, was released on July 2, 2025. Oral argument in these appeals was held on July 15, 2025. Appellants did not argue against *Courtney's* application of the amended rule at oral argument and they have not requested supplemental briefing on this issue.

not work injustice. To reverse and remand for a new trial because Dr. Wilkey had not met the active-clinical-practice requirement at the time of trial, only to have his testimony be admissible in a new trial does not serve the interests of justice and would be a waste of judicial resources.

**{¶68}** We accordingly hold that the trial court did not err in permitting Dr. Wilkey to testify and in denying Appellants' motions for a JNOV or a new trial on this ground.

### B. *Jury Instruction on Durrani's Absence*

**{¶69}** Appellants next argue that the trial court improperly instructed the jury on Durrani's absence. A trial court's decision granting or denying a proposed jury instruction is reviewed for an abuse of discretion. *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 65 (1st Dist.). But "'[t]he question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.'" *Jones*, 2024-Ohio-1776, at ¶ 29 (1st Dist.), quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 22.

**{¶70}** The trial court issued the following instruction to the jury on Durrani's absence over Appellants' objection:

> The defendant, Dr. Durrani, has not attended these proceedings in person. He is represented here by counsel. You shall not speculate on why he is not present or consider his absence for any purpose except as instructed below.
>
> Dr. Durrani has voluntarily left the jurisdiction, removing himself from plaintiffs' ability to subpoena him to trial.
>
> When a party, such as Dr. Durrani, has relevant evidence or testimony within his or her control and the party fails to produce that

relevant evidence or testimony, that failure gives rise to an inference that the evidence or testimony is unfavorable to that party.

**{¶71}** In support of their argument that this instruction was improper, Appellants direct us to *Hounchell*, 2023-Ohio-2501 (1st Dist.). In *Hounchell*, we held that the trial court abused its discretion in instructing the jury, "You are allowed to consider as part of your deliberation the fact that Dr. Durrani did not attend the trial and testify to specific facts about this case in his defense. And you may make whatever inference and conclusions you choose to from that fact." *Id.* at ¶ 65 and 70. We held in *Hounchell* that the instruction provided by the trial court "went beyond recognizing that Durrani was absent from trial" and allowed the jury to draw impermissible inferences. *Id.* at ¶ 69. Appellants argue that the instruction provided by the trial court in this case was worse than the general instruction provided in *Hounchell* because it mandated that the jury infer that testimony offered by Durrani would have shown his negligence.

**{¶72}** The same jury instruction that was given in the case at bar was also given in *Jones*. In considering a challenge to that instruction, the *Jones* court recognized that the provided instruction was more limited than the instruction that had been given in *Hounchell* because it permitted "only the inference that the testimony or evidence in Dr. Durrani's possession would be unfavorable to him." *Jones*, 2024-Ohio-1776, at ¶ 31 (1st Dist.). We nonetheless held that the trial court erred in providing the instruction because it *required* an inference to be made under certain circumstances, rather than *permitted* the jury to make an inference if it so chose. *Id.* at ¶ 34. We further found error in the fact that the instruction "allowed the inference to be made based on the failure to be produce *any* relevant evidence in his possession" and was not limited to evidence that would naturally be produced. (Emphasis in original.) *Id.*

26

{¶73} We ultimately held, however, that the error in issuing this instruction was not reversible because a review of the jury instructions as a whole did not indicate that the jury was likely to have been misled by the instruction. *Id.* at ¶ 37. This was because the trial court had also instructed the jury that it was not required to make any inferences and that whether an inference was to be made was within the jury's discretion. *Id.* at ¶ 37-38.

{¶74} As it did in *Jones*, the trial court also instructed the jury in Fenner's and Schuster's cases that "[t]o infer or to make an inference is to reach a reasonable conclusion of facts which you may, but are not required to make, from other facts which you find have been established by direct evidence" and "[w]hether an inference is made rests entirely with you." We follow *Jones* and hold that while the instruction on Durrani's absence was erroneous, the instructions as a whole were not misleading and the erroneous instruction was not so prejudicial as to require reversal. *See Jones*, 2024-Ohio-1776, at ¶ 40 (1st Dist.).

{¶75} Appellants' second assignment of error is accordingly overruled.

## IV. *Damages*

{¶76} In their third assignment of error, Appellants argue that the trial court erred in entering judgment in the amount of $380,691.21 for Fenner and $348,060.84 for Schuster. In this assignment of error, they challenge the trial court's award of past medical expenses and prejudgment interest and argue that the trial court erred in failing to allow a setoff.

### A. *Past Medical Expenses*

{¶77} Appellants first argue that the trial court erred by allowing the jury to consider and award damages for past medical expenses. Appellants' argument is two-fold. They first argue that past medical expenses should not have been awarded to

Appellees because Appellees' insurers were the real parties in interest for these damages and they were not joined in the action. They also argue that the trial court's requirement that Appellees obtain a release from their insurers before receiving damages for past medical expenses did not adequately protect Appellants from prejudice from Appellees' failure to join the real parties in interest. Appellants contend that Appellees' receipt of damages for past medical expenses impacted the punitive damages cap, and that, because Appellees were not the real parties in interest as to those damages, the trial court should have removed the jury's awards of past medical expenses from its calculation of compensatory damages when determining the punitive damages awards.

{¶78} Appellants have not asserted an assignment of error challenging the trial court's failure to order joinder of Appellees' insurers pursuant to Civ.R. 17 and 19. Rather, as set forth in their third assignment of error, they have challenged the trial court's awards of damages. Accordingly, as we consider Appellants' arguments, we review the record to determine if the trial court appropriately allowed Appellees to be awarded damages for past medical expenses and properly calculated the awards of punitive damages, and not whether Appellants suffered prejudice from the trial court's failure to require joinder of real parties in interest. *See Courtney*, 2025-Ohio-2335, at ¶ 97 (1st Dist.), quoting *Saylor v. Saylor*, 2020-Ohio-3647, ¶ 29 (1st Dist.) ("'Appellate courts review assignments of error—we sustain or overrule only assignments of error and not mere arguments.'").

{¶79} When ruling on the parties' post-trial motions, the trial court found that the insurers should have been joined as parties pursuant to Civ.R. 19 because they

were the real parties in interest with respect to past medical expenses.[7] But the court held that it was unwilling to grant Appellants' request to vacate the awards for past medical expenses. Instead, the court ordered that Appellees could not receive the amounts awarded for past medical expenses to which the insurers had a right of subrogation until adequate releases were obtained.

{¶80} We approved of this approach in *Courtney*, holding that the trial court did not err in allowing the plaintiffs to recover past medical expenses if similar releases were obtained, even though their insurers, who were the real parties in interest, had not been joined. *Id.* at ¶ 95. We explained that "Civ.R. 19(A) vests trial courts with considerable flexibility in determining when a party is necessary and when its appearance is feasible," *id.*, and that "the Ohio Supreme Court has advised that dismissal for the failure to join a necessary party is warranted 'only where the defect cannot be cured.'" *Id.*, quoting *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 81 (1989). We accordingly follow *Courtney* and hold that the trial court did not err in allowing the jury to consider and award damages for past medical expenses to Appellees where it conditioned the receipt of those damages on the requirement that Appellees obtain releases from their insurers.

{¶81} We next consider Appellants' argument that the trial court should have removed the jury's awards of past medical expenses from the court's calculation of compensatory damages when determining the punitive damages awards.

{¶82} The concurring opinion suggests that we should not address Appellants' argument regarding punitive damages because it was not raised as an issue presented for review under this assignment of error and is instead raised as a "mere argument."

---

[7] The trial court's statement pertained to all Appellees' insurers but for Medicare, which the court recognized it could not have forced to join the action.

It contends, "If this court is declining to address the issue of joinder on the basis that no assignment of error was raised related to joinder, then we should similarly decline to address any argument pertaining to prejudice from the failure to join the insurers, without recasting the argument into an issue that was never raised." The concurring opinion ignores the fact that the assignment of error contains a challenge to the *total, overall awards of damages* to both Fenner and Schuster. This includes the award of punitive damages.

**{¶83}** In contrast, the assignment of error raised in *Courtney* was that "the trial court erred in permitt[ing] Courtney and Koelblin to recover monetary damages for their past medical expenses without joining as parties the insurance companies that actually paid those expenses." *Courtney*, 2025-Ohio-2335, at ¶ 91 (1st Dist.). Where the assignment of error in *Courtney* solely challenged the award of past medical expenses, the court declined to address arguments concerning punitive damages. *Id.* at ¶ 97. As in *Courtney*, Appellants' argument in the case at bar concerning punitive damages is tied to their argument concerning the jury's awards of past medical expenses. But unlike *Courtney*, the assignment of error in this case challenges the total, overall damages awarded. Under these circumstances, it is appropriate to consider Appellants' arguments concerning punitive damages.

**{¶84}** R.C. 2315.21 governs our review of the trial court's award of punitive damages. Pursuant to R.C. 2315.21(D)(2)(b), no matter the amount of punitive damages awarded by the jury, the trial court in the case at bar was prohibited from entering judgment for punitive damages in excess of "two times the amount of the compensatory damages awarded to the plaintiff from the defendant." Here, the trial court's calculation of compensatory damages included damages awarded for past medical expenses and for pain and suffering.

30

**{¶85}** The Eighth District interpreted this provision in *Sivit v. Village Green of Beachwood L.P.,* 2016-Ohio-2940 (8th Dist.). Applying the plain language of the statute, the court stated,

> Under R.C. 2315.21(D)(2)(a), the cap on punitive damages is computed by multiplying "the amount of the compensatory damages awarded to *the plaintiff*" times two. (Emphasis added.) The definite "the plaintiff" referenced in R.C. 2315.21(D)(2)(a) refers back, by its terms, to (1) the "plaintiff" identified in R.C. 2315.21(B)(2) (jury trials) or (3) (bench trials), as applicable, i.e., "*a plaintiff* [who] makes a claim for both compensatory damages and punitive or exemplary damages," and (2) the "determin[ation]" made in accordance with that provision, i.e., the jury's "answers to an interrogatory that specifies the total compensatory damages recoverable by *the plaintiff* from each defendant." (Emphasis added.) *See also* R.C. 2315.21(C)(2) ("punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless * * * [t]he trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by *the plaintiff* from that defendant.") (Emphasis added.).

*Id.* at ¶ 30. The court in *Sivit* was concerned with whether, when calculating the punitive damages to be awarded to a plaintiff that had requested punitive damages, the trial court could include compensatory damages awarded to another plaintiff that had not requested punitive damages. Applying the text-focused approach set forth above, the court answered that question in the negative. *Id.* at ¶ 34.

**{¶86}** Unlike *Sivit,* there were no plaintiffs involved in these actions that failed

31

to request punitive damages. Rather, Fenner and Schuster were the sole plaintiffs in their respective cases, and they both requested punitive damages. Where no "compensatory damages [were] awarded to other plaintiffs, i.e., the insurer plaintiffs," *id.* at ¶ 29, and all compensatory damages went to the injured plaintiffs, then all compensatory damages counted toward the punitive cap, including the award of damages for past medical expenses.

**{¶87}** We accordingly find no error in the trial court's inclusion of the jury's awards of past medical expenses when calculating the statutory cap on punitive damages.

### B. Prejudgment Interest

**{¶88}** Appellants next argue that the trial court should not have awarded prejudgment interest to Appellees because Appellees failed to make a good-faith effort to settle.

**{¶89}** Pursuant to R.C. 1343.03(C), where a motion has been made by a party to a civil action that is based on tortious conduct, and where the court rendered a judgment in that action for the payment of money, the trial court is permitted to award prejudgment interest if "the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." *See Jones*, 2024-Ohio-1776, at ¶ 42 (1st Dist.).

**{¶90}** The Ohio Supreme Court has delineated when a party "*has not* 'failed to make a good faith effort to settle.'" (Emphasis added.) *Kalain v. Smith*, 25 Ohio St.3d 157 (1986), syllabus. Where a party has "(1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to

unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party," the party has not failed to make the required good-faith effort. *Id.* A party is not required to make a good-faith effort to settle where the party has a "good faith, objectively reasonable belief" that the party has no liability. *Id.*

**{¶91}** A decision as to whether a party's settlement efforts were in good faith is within the trial court's discretion. *Id.* at 159; *Bender v. Durrani*, 2024-Ohio-1258, ¶ 151 (1st Dist.).

**{¶92}** The trial court initially granted Appellees' motions for prejudgment interest in its April 22, 2024 decisions on post-trial motions. But, apparently aware of this court's holding in *Jones*, 2024-Ohio-1776, at ¶ 43 (1st Dist.), that the trial court had abused its discretion in awarding prejudgment interest where no "evidence" was admitted at the hearing or submitted with the relevant motions, the trial court held a hearing on the issue of prejudgment interest on June 17, 2024.

**{¶93}** Prior to the hearing, Appellees each submitted an affidavit from their counsel, Benjamin M. Maraan, II, stating that they had made a settlement demand of one million dollars to Appellants on August 16, 2021. The affidavits further stated that the jury had rendered verdicts in this case in excess of that demand, and that Schuster was owed $34,611.84 in prejudgment interest, while Fenner was owed $40,134.21. Affidavits were also submitted by James F. Brockman, counsel for Appellants.

**{¶94}** At the hearing, the trial court discussed the factors set forth in *Kalain* and heard argument from counsel. The court noted that Appellants had made no individual offers to settle with Schuster and Fenner and had instead only been willing to consider a "global settlement" with all plaintiffs involved in litigation against Durrani. The court ultimately determined that an award of prejudgment interest was

33

appropriate. In the final appealable orders issued in July of 2025, the trial court found that Appellees were entitled to an award of prejudgment interest because Appellants had failed to make a good-faith offer to settle and Appellees had not failed to make a good-faith effort. It awarded Appellees the amounts of prejudgment interest set forth in Maraan's affidavits.

**{¶95}** Appellants argue that Appellees did not make a good-faith effort to settle because their demand of one million dollars was not reasonable and it was not realistic for them to achieve a jury verdict close to that number given the applicable statutory caps on damages. As set forth in *Kalain*, a party did not fail to make a good-faith effort to settle where the party, among other considerations, rationally evaluated its risks and potential liability. *Kalain,* 25 Ohio St.3d 157, at syllabus. "[I]t is incumbent on a party seeking an award [of prejudgment interest] to present evidence of a[n] . . . offer to settle that was reasonable considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle." (Cleaned up.) *Cunning v. Windsor House, Inc.*, 2023-Ohio-352, ¶ 119 (11th Dist.). "The question of whether a good-faith effort to settle a case has been made depends on whether the amount of the offer was based on an objectively reasonable belief." *Andre v. Case Design, Inc.*, 2003-Ohio-4960, ¶ 18 (1st Dist.).

**{¶96}** This case law makes clear that a plaintiff's settlement offer must be based on an objectively reasonable belief that the amount offered in settlement could be awarded under applicable law. This includes any applicable statutory caps on damages. Appellants argue that any damages awarded to Appellees were subject to the statutory caps on punitive and noneconomic damages.

**{¶97}** R.C. 2315.21(D)(2)(b) limits the amount of punitive damages that a

plaintiff can be awarded. This statute provides that the punitive damages awarded could not exceed "the lesser of two times the amount of the compensatory damages awarded to the plaintiff from the defendant or ten per cent of the employer's or individual's net worth when the tort was committed up to a maximum of three hundred fifty thousand dollars." R.C. 2315.21(D)(2)(b). Appellees could therefore have received a maximum of $350,000 in punitive damages, and any settlement offer had to take this limitation into consideration.

{¶98} R.C. 2323.43(A)(2) imposes a statutory cap on non-economic damages in medical-malpractice actions and provides,

> Except as otherwise provided in division (A)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the plaintiff's economic loss, as determined by the trier of fact, to a maximum of three hundred fifty thousand dollars for each plaintiff or a maximum of five hundred thousand dollars for each occurrence.

{¶99} However, pursuant to subdivision (A)(3), the amount of compensatory damages that may be awarded for noneconomic loss "may exceed the amount described in division (A)(2) of this section but shall not exceed five hundred thousand dollars for each plaintiff" where the damages are for "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities."

R.C. 2323.43(A)(3).

{¶100} "R.C. 2323.43(A) creates a two-tiered system imposing limits on the award of noneconomic damages depending on the severity of the plaintiff's injury." *Paganini v. Cataract Eye Ctr. of Cleveland*, 2025-Ohio-275, ¶ 60 (8th Dist.). The first tier imposes a cap of $250,000 for certain types of injuries. *Id*. The second tier increases the limit for the type of injuries described in subdivision (A)(3)—in other words, for injuries that result in a catastrophic loss. *Id*.

{¶101} Appellees attempted to seek recovery under the increased damages limit in R.C. 2323.43(A)(3). At the close of evidence, Appellants moved for a directed verdict on this issue, arguing that "[w]e do not believe that the testimony to date has supported the catastrophic loss instruction under Revised Code 2323.43. So that issue should not be submitted to the jury."

{¶102} The trial court denied Appellants' motion, and the issue of whether Appellees had suffered a catastrophic loss was submitted to the jury. While the jury ultimately returned an interrogatory finding that such loss had not been suffered by either plaintiff, we cannot find that Appellees acted in bad faith by failing to apply the lower statutory cap set forth in the first tier of R.C. 2323.43(A)(3) when making their settlement offers.

{¶103} Appellees' one-million-dollar settlement offers were based on an objectively reasonable belief that they could be awarded the amount requested under applicable law. Appellees sought to be awarded economic damages for past medical expenses, noneconomic damages for pain and suffering, punitive damages, and attorney fees.

{¶104} As previously explained, Appellees could receive a maximum of $350,000 in punitive damages. And pursuant to R.C. 2323.43(A)(3), they could have

received up to $500,000 in noneconomic damages.[8] With respect to the economic damages awarded for past medical expenses, the jury could lawfully have awarded Appellees either the amount billed for these expenses or the amount accepted in payment.[9] The record establishes that Schuster was billed $168,000 in medical expenses. Fenner was billed $96,424. And because each Appellee ultimately received $30,000 in attorney fees, we use that number in our analysis.[10]

{¶105} Applying these considerations and limitations, Schuster and Fenner could have potentially received approximately $1,048,000 and $976,424 in total damages, respectively. Of course, they each actually received much less,[11] which is also a relevant consideration in our analysis. "Although R.C. [1343.03(C)] does not require the parties to predict the jury verdict, the proximity of a party's settlement offer to the ultimate verdict is circumstantial evidence of the reasonableness of the party's evaluation of the case." *Hammons v. Spiller*, 1989 Ohio App. LEXIS 4302, *6 (12th Dist. Nov. 20, 1989); *see Strasel v. Seven Hills Ob-Gyn Assocs.*, 2007-Ohio-171, ¶ 35 (1st Dist.) ("One factor demonstrating whether a party has made a good-faith effort to settle is the disparity between the settlement offer and the amount of the jury verdict.").

{¶106} Despite the fact that the jury ultimately awarded significantly less than

---

[8] Although Appellees could have each received $500,000 in noneconomic damages, during closing argument Appellees' counsel asked the jury to award Schuster $250,000 and Fenner $350,000 in noneconomic damages.

[9] When instructing the jury on what it may award for past medical expenses, the court stated, "both the original bill and the amount accepted as full payment may be considered along with all other evidence to determine the reasonable value."

[10] It appears that this number was reached by agreement between counsel at a post-trial hearing on March 22, 2024.

[11] The statutory cap on punitive damages resulted in Schuster receiving $188,966 and Fenner $207,038 in punitive damages, rather than the maximum amount of $350,000. And each Appellee was awarded the amount paid in past medical expenses, rather than the amount billed. Further, the awards received for noneconomic damages were much less than had been requested and available under law. Schuster received $50,000 in noneconomic damages for pain and suffering and Fenner $65,000.

had been requested, Appellees' settlement offers were based on the maximum amounts that could have been obtained under available law, had the jury found in favor of Appellees on all issues. On this record, we can find no abuse of discretion in the trial court's determination that Appellees did not fail to make a good-faith effort to settle.

{¶107} We accordingly hold that the trial court did not err in awarding prejudgment interest to Appellees.

### C. Setoff

{¶108} Appellants last argue that the trial court erred in denying their motions for a setoff based on Appellees' settlement with West Chester Hospital and UC Health. They argue that this court's precedent on the issue of a setoff, as set forth in *Eysoldt v. Proscan Imaging*, 2011-Ohio-6740 (1st Dist.), and *Adams v. Durrani*, 2022-Ohio-60 (1st Dist.), has been called into question by *Gorsha v. Clark*, 2022 U.S. Dist. LEXIS 16485 (S.D. Ohio Jan. 31, 2022), and they ask us to overturn *Eysoldt* and *Adams*.

{¶109} We begin by setting forth the provisions in the Ohio Revised Code that are implicated in an analysis of whether Appellants are entitled to a setoff. We then explain our precedent on the issue of a setoff, before turning to a discussion of *Gorsha* and its impact on that precedent.

### 1. Revised Code Provisions

{¶110} R.C. 2307.28 is implicated when a plaintiff has brought an action against more than one tortfeasor for the same injury or loss and settles with one of the tortfeasors. It provides that the settlement with one tortfeasor

> does not discharge any of the other tortfeasors from liability for the
> injury, loss, or wrongful death unless its terms otherwise provide, but it
> *reduces the claim against the other tortfeasors* to the extent of the

38

greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it, except that the reduction of the claim against the other tortfeasors shall not apply in any case in which the reduction results in the plaintiff recovering less than the total amount of the plaintiff's compensatory damages awarded by the trier of fact and except that in any case in which the reduction does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact.

(Emphasis added.) R.C. 2307.28(A).

{¶111} R.C. 2307.25(A), in turn, addresses the right of contribution and provides, in relevant part,

Except as otherwise provided in sections 2307.25 to 2307.28 of the Revised Code, if one or more persons are jointly and severally liable in tort for the same injury or loss to person or property or for the same wrongful death, there may be a right of contribution even though judgment has not been recovered against all or any of them. . . . There is no right of contribution in favor of any tortfeasor against whom an intentional tort claim has been alleged and established.

### 2. *This Court's Precedent*

{¶112} This court first addressed the issue of whether one tortfeasor was entitled to a setoff in *Eysoldt*, 2011-Ohio-6740 (1st Dist.). In *Eysoldt*, the plaintiffs filed suit against Go Daddy.com, Inc., ("Go Daddy") for invasion of privacy and conversion. Other causes of action were filed against additional defendants, but those defendants settled their claims. *Id.* at ¶ 2. A jury found in favor of the plaintiffs on their claims against Go Daddy and awarded damages. *Id.* at ¶ 3. Go Daddy subsequently

39

filed a motion for partial satisfaction of judgment, arguing that the plaintiffs' damages should have been reduced by the amount they received from the settling defendants. The trial court denied that motion and Go Daddy appealed, arguing that it was entitled to a setoff under R.C. 2307.28. *Id.* at ¶ 5-6.

**{¶113}** We explained in *Eysoldt* that, under R.C. 2307.28, "a release reduces the claim against the other tortfeasors by the amount of the consideration paid in exchange for the release." *Id.* at ¶ 7. But we held that we need not reach the issue of whether Go Daddy was entitled to a setoff under R.C. 2307.28 because Go Daddy's argument ignored the plain language of R.C. 2307.25(A), which provided that there was no right of contribution in favor of a tortfeasor that was established to have committed an intentional tort. *Id.* at ¶ 8. We relied on *Jones v. VIP Dev. Co.*, 15 Ohio St.3d 90 (1984), to hold that R.C. 2307.25 did not entitle Go Daddy to a setoff because it had committed two intentional torts. *Id.* at ¶ 9-14. We explained that, in *Jones*, the Ohio Supreme Court had

> interpreted the former version of R.C. 2307.25 as providing a narrow legislative exception to the general rule that among joint tortfeasors, the plaintiff is entitled to only one recovery. Under that exception, when a plaintiff recovers from or settles with another tortfeasor and subsequently obtains a judgment against an intentional tortfeasor for the same injury, the plaintiff may recover more than the amount required to make the plaintiff whole because the intentional tortfeasor is not entitled to any reduction in the award against him, regardless of the amount of the previous judgment or settlement.

*Id.* at ¶ 10, citing *Klosterman v. Fussner*, 99 Ohio App.3d 534, 540 (2d Dist. 1994).

**{¶114}** Because *Eysoldt's* holding was based on *Jones*, a discussion of *Jones* is

necessary. *Jones* was decided before the General Assembly enacted the current versions of R.C. 2307.25 and 2307.28 and was based on the predecessors to these statutes, former R.C. 2307.31 and 2307.32.[12] The *Jones* court considered whether an intentional tortfeasor was entitled to a setoff. Answering that question in the negative, the court held,

> Although R.C. 2307.32(F) allows for a reduction of a judgment by the amount paid by another tortfeasor in exchange for a covenant not to sue, we are persuaded that the legislature did not intend that such reduction may benefit an intentional wrongdoer. It would be nonsensical to hold that while an intentional tortfeasor may not profit by means of contribution from a fellow wrongdoer, he may nevertheless secure a reduction in the judgment against him by the sum paid to plaintiff in exchange for a covenant not to sue. We refuse to presume that the legislature intended this incongruous result.

*Id.* at 98.

{¶115} In *Adams*, 2022-Ohio-60 (1st Dist.), this court followed *Eysoldt* to hold that Durrani and CAST were not entitled to a setoff based on the amount that the plaintiff in that case had received from a settlement with West Chester Hospital and UC Health. We explained,

> If a settling defendant is liable for any of the tort plaintiff's damages, then a nonsettling defendant is entitled to a setoff under R.C. 2307.28. However, an intentional tortfeasor is not entitled to a setoff. R.C.

---

[12] Former R.C. 2307.31(A) was the predecessor to R.C. 2307.25, and it provided that "[t]here is no right of contribution in favor of any tortfeasor who has intentionally caused or intentionally contributed to * * * [an] injury or wrongful death." *Jones* at 98. Former R.C. 2307.32 was the predecessor to R.C. 2307.28.

2307.25 provides for contribution where "one or more persons are jointly and severally liable in tort for the same injury or loss to person or property * * *." However, the statute explicitly prohibits intentional tortfeasors from receiving contribution. This is characterized as a narrow legislative exception to the general rule that among joint tortfeasors, the plaintiff is entitled to only one recovery.

(Cleaned up.) *Id.* at ¶ 77. We noted that Durrani and CAST had been found liable for both intentional and unintentional torts and that "the torts all contributed to the same injuries in a manner that makes it impractical to determine which tort caused which injury." *Id.* at ¶ 79. The *Adams* court ultimately concluded that "[b]ecause we cannot distinguish between the injuries caused by the battery and those caused by the unintentional torts, we hold that Durrani is not entitled to any setoff under R.C. 2307.28." *Id.* at ¶ 89.

### 3. *Gorsha*

**{¶116}** In *Gorsha*, 2022 U.S. Dist. LEXIS 16485, at *15, several nonsettling defendants argued that they were entitled to a setoff on the amount of damages that they owed to the plaintiffs based on the plaintiffs' settlement with another defendant. The settling defendant had been sued for the tort of legal malpractice. *Id.* The nonsettling defendants were found liable for the intentional tort of conversion. *Id.* The plaintiffs relied on R.C. 2307.25 to argue that the nonsettling defendants were not entitled to a reduction in damages because they had committed an intentional tort. *Id.* at *16. Whereas the defendants asking for a setoff relied on the language in R.C. 2307.28(A) providing that "a release reduces the claim against the other tortfeasors by the amount of the consideration paid in exchange for the release." *Id.*

**{¶117}** The district court discussed *Eysoldt* when considering the parties'

arguments regarding setoff. *Id.* at 16-17. It explained that *Eysoldt* had relied on *Jones* and *Klosterman* to conclude that R.C. 2307.25 provided a narrow legislative exception to the general rule that a plaintiff is only entitled to one recovery among tortfeasors and that an intentional tortfeasor is not entitled to a reduction in damages regardless of the plaintiff's settlement with another defendant. *Id.* at *18-19. After explaining *Eysoldt,* the *Gorsha* court specifically stated that it "does not reach the same conclusion." *Id.* at *19. It stated that R.C. 2307.25 was not implicated in the analysis because the "issue before the Court is not an instance of one co-defendant seeking to exercise its right of contribution against another co-defendant," but rather one defendant seeking to reduce its damages owed to plaintiff pursuant to R.C. 2307.28. *Id.*

{¶118} The *Gorsha* court explained that *Jones* and *Klosterman* had relied on former R.C. 2307.31(A) and former R.C. 2307.32(F), and that after those decisions were issued, the General Assembly revised R.C. Ch. 2307. In doing so, the General Assembly repealed R.C. 2307.31 and 2307.32, and enacted R.C. 2307.25 and 2307.28. *Id.*, citing 2001 Ohio S.B. 120. The court held that by adding the language "except that in any case in which the reduction does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact," to R.C. 2307.28(A), "the General Assembly resolved any ambiguity concerning the availability of double recovery." *Id.* at *20.

{¶119} *Gorsha* held that "the Supreme Court of Ohio's discussion of § 2307.32(F) [in *Jones*] is superseded by statute, and the *Klosterman* panel's identification of the existence of 'a narrow legislative exception to the general rule that among joint tortfeasors the plaintiff is entitled to only one recovery' is nullified." *Id.* Therefore, *Gorsha* determined, "the *Eysoldt* panel's determination that a plaintiff is

entitled to a double recovery defies the plain language of § 2307.28(A)." *Id.* The court ultimately held that "[a]fter considering the record evidence and applying the plain language of § 2307.28(A), the Court finds as a matter of law that Plaintiffs are not entitled to a double recovery." *Id.* at *21.

### *4. Impact of Gorsha*

**{¶120}** In *McCann*, 2023-Ohio-3953, at ¶ 55, fn. 3 (1st Dist.), we noted that *Gorsha* had "called into question the soundness of our decision in *Eysoldt*, and by implication our decision in *Adams*." But because the parties in *McCann* had not argued that our prior decisions regarding R.C. 2307.28 were erroneous, we declined to address the issue.

**{¶121}** Here, Appellants have squarely argued that our prior decisions regarding setoff in *Eysoldt* and *Adams* should be overturned. For the following reasons, we agree.

**{¶122}** First, as the *Gorsha* court noted, it is R.C. 2307.28(A) that is implicated in the case at bar, and not R.C. 2307.25(A). The latter statute, R.C. 2307.25(A), comes into play when one defendant seeks contribution from another defendant. That is not the case here. Rather, one defendant is seeking a setoff from the amount of damages owed to a plaintiff based on the plaintiff's settlement with other defendants. R.C. 2307.25(A) has no bearing on this analysis.

**{¶123}** Second, even if R.C. 2307.25(A) was somehow implicated, the first sentence of that statute provides, "Except as otherwise provided in sections 2307.25 to 2307.28 of the Revised Code." The statute plainly indicates that it will not be applied if it contradicts R.C. 2307.28.

**{¶124}** Third, the plain language of R.C. 2307.28(A) prohibits a plaintiff from receiving a double recovery. It states, "except that in any case in which the reduction

does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact." As the *Gorsha* court noted, by using this language, "the General Assembly resolved any ambiguity concerning the availability of double recovery." *Gorsha*, 2022 U.S. Dist. LEXIS 16485, at *20.

**{¶125}** Like the case at bar, both *Eysoldt* and *Adams* involved a defendant who sought a setoff of damages owed to the plaintiff based on the plaintiff's settlement with another defendant, rather than a defendant that sought contribution from an additional defendant. *Eysoldt*, and subsequently *Adams* in following it, failed to consider this, as well as failed to recognize that *Jones* had been superseded by statute. These cases, therefore, erred in holding that "the supreme court interpreted the former version of R.C. 2307.25 as providing a narrow legislative exception to the general rule that among joint tortfeasors, the plaintiff is entitled to only one recovery" and in determining that intentional tortfeasors were never entitled to a setoff. *Eysoldt*, 2011-Ohio-6740, at ¶ 10 (1st Dist.); *Adams*, 2022-Ohio-60, at ¶ 77 (1st Dist.).

**{¶126}** The Ohio Supreme Court has set forth a three-part test for determining when wrongfully-decided precedent can be abandoned. *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849. Under this test, wrongfully-decided precedent may be overturned where "(1) the decision was wrongly decided at that time, or changes in circumstances no longer justify continued adherence to the decision, (2) the decision defies practical workability, and (3) abandoning the precedent would not create an undue hardship for those who have relied upon it." *Id.* at paragraph one of the syllabus; *accord State v. Stewart,* 2024-Ohio-2150, ¶ 14 (1st Dist.).

**{¶127}** All three prongs are satisfied here. First, as set forth in the preceding paragraphs, *Eysoldt* and *Adams*, which followed *Eysoldt*, were wrongly decided. They

45

relied on an Ohio Supreme Court case that had been superseded by statute. Second, because the current versions of R.C. 2307.25 and 2307.28 cannot be applied as written and intended without conflicting with *Eysoldt* and *Adams*, the decisions defy practical workability. Third, abandoning *Eysoldt's* and *Adams's* holdings regarding a setoff would not create an undue hardship for those who have relied on them. Abandonment of this precedent simply ensures that a plaintiff does not receive a double recovery. We accordingly overrule *Eysoldt* and *Adams* to the extent that they relied on *Jones* and held that intentional tortfeasors are not entitled to a setoff under R.C. 2307.28(A).

{¶128} We therefore hold, pursuant to the plain language of R.C. 2307.28(A), that Appellants are entitled to a setoff based on Appellees' settlement with West Chester Hospital and UC Health. The third assignment of error is sustained in part and overruled in part.

## *V. Conclusion*

{¶129} The trial court's judgments are affirmed in part and reversed in part. We find no error in the trial court's consolidation of Appellees' cases for trial and its denial of Appellants' motions for JNOV or a new trial. We further find no error in the trial court's decision to award prejudgment interest to Appellees and its determination that Appellees are entitled to receive the jury's awards of past medical expenses if they obtain adequate releases from their insurers. But we hold that the trial court erred in failing to award Appellants a setoff based on Appellees' settlement with West Chester Hospital and UC Health. We accordingly remand this cause for the trial court to determine the amount of a setoff to which Appellants are entitled and to issue judgment accordingly.

Judgments affirmed in part, reversed in part, and cause remanded.

46

**NESTOR, J.,** concurs.

**ZAYAS, P.J.,** concurs in part and concurs in judgment only in part.

**ZAYAS, P.J.,** concurring in part and concurring in judgment only in part.

{¶130} In the first assignment of error, appellants argue that the trial court "should have ordered new trials with single plaintiffs." I concur with the majority's opinion on this assignment of error, subject to a caveat—set forth below—regarding the proper postjudgment considerations when assessing prejudice from the joinder of trials under Civ.R. 42.

{¶131} In the second assignment of error, appellants argue that the trial court erred in denying their motions for judgment notwithstanding the verdict and a new trial. I concur with the majority's opinion on this assignment of error.

{¶132} In the third assignment of error, appellants specifically argue that the trial court "erred in entering judgment in the amount of $380,691.21 for Ms. Reeder and $348,060.84 for Mr. Pridemore." Within this assignment of error, they raise three explicit issues for review: (1) the trial court "should not have allowed plaintiffs to pursue claims for past medical expenses at trial," (2) the trial court "should not have awarded prejudgment interest," and (3) the trial court "should have allowed a setoff." I concur in the majority's opinion on the second and third issues presented for review and the first issue presented for review, in part. However, I must concur in judgment only, in part, on the first issue presented for review. As more fully explained below, the opinion addresses the issue of punitive damages, even though the appellants never raised punitive damages within the assignment of error, in contradiction of this court's precedent in *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 97 (1st Dist.). "This court is limited to determining the merits of any appeal 'on the assignments of error set forth in the briefs.'" *Saylor v. Saylor*, 2020-Ohio-3647, ¶ 29 (1st Dist.), quoting *State v.*

*Harris*, 2017-Ohio-5594, ¶ 43 (1st Dist.) I decline to join in going beyond the assignment of error. Therefore, I concur in judgment on this part of the majority's opinion.

### I. *Prejudice from Joinder of Trials Under Civ.R. 42*

{¶133} In the first assignment of error, appellants argue that the trial court "should have ordered new trials with single plaintiffs." I agree with the majority's opinion that resolution of this assignment of error is ultimately governed by *Jones v. Durrani*, 2024-Ohio-1776 (1st Dist.), and *Courtney*. I write separately to clarify the proper postjudgment considerations when assessing prejudice from the joinder of trials under Civ.R. 42.

{¶134} Appellants argue that the joinder of trials "allowed each Plaintiff to present additional, extraneous evidence against Dr. Durrani that they otherwise could not have presented." They list two "examples" of such evidence: testimony that Dr. Durrani did not sign off on Mr. Pridemore's clinical note for approximately eight months, and testimony about a note in Ms. Reeder's medical file saying that she "unfortunately" had surgery with Dr. Durrani.

{¶135} In *Courtney*, 2025-Ohio-2335 (1st Dist.), this court articulated that, to undermine proper "consolidation" under Civ.R. 42, a party claiming prejudice "must demonstrate *unfair* prejudice." (Emphasis in original.) *Id*. at ¶ 57. In setting forth this standard, the court cited to *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169 (2001). However, *Oberlin* set the standard for what amounts to "unfair prejudice" when considering a different matter: whether evidence should be excluded under Evid.R. 403. Thus, *Oberlin* does not establish "unfair prejudice" as the relevant inquiry when conducting a postjudgment assessment of any prejudice that resulted from the joinder of trials under Civ.R. 42. Therefore, to the extent that the majority's

opinion relies on this court's prior decision as precedent in evaluating "unfair prejudice" from the joinder of trials, I must disagree as there is no mention of "unfair prejudice" in the plain language of Civ.R. 42 and no other authority to support such a standard. *See generally, e.g., In re N.M.P.*, 2020-Ohio-1458, ¶ 21, citing *Dodd v. Croskey*, 2015-Ohio-2362, ¶ 24, and *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81 (1997) ("It is a cardinal rule of statutory construction that a statute's meaning is determined by the language used. If the language is clear and unambiguous, we apply the statute as written and refrain from adding or deleting words.").

{¶136} That being said, I nevertheless concur in the opinion on this issue as this court conducted the appropriate substantive analysis in *Courtney* when assessing prejudice and the majority's opinion ultimately continues that analysis here.

{¶137} When conducting a postjudgment assessment of any prejudice that resulted from the joinder of trials under Civ.R. 42, this court must ultimately look to the record to determine whether substantial justice has been done to the complaining party. *See* Civ.R. 61 ("No error in the admission . . . of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceedings which does not affect the substantial rights of the parties."); R.C. 2309.59 ("In every stage of an action, the court shall disregard any error or defect in the . . . proceedings which does not affect the substantial rights of the adverse party. No final judgment or decree shall be reversed or affected by reason of such error or defect. . . . If the reviewing court

49

determines and certifies that, in its opinion, substantial justice has been done to the party complaining as shown by the record, all alleged errors or defects occurring at the trial shall be deemed not prejudicial to the party complaining and shall be disregarded, and the final judgment or decree under review shall be affirmed. . . .").

**{¶138}** ""'Generally, in order to find that substantial justice has been done to [a party] so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision.'"" *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 35, quoting *O'Brien v. Angley*, 63 Ohio St.2d 159, 164-165 (1980).

**{¶139}** "In ascertaining whether prejudicial error exists, the court is 'bound by the disclosures of the record.'" *Hayward v. Summa Health Sys.*, 2014-Ohio-1913, ¶ 25, citing *Makranczy v. Gelfand*, 109 Ohio St. 325, 329 (1924).

**{¶140}** Where a thorough review of the record shows that the jury properly considered each case separately and on its own merit, as instructed, the record does not indicate prejudice from the joinder of trials under Civ.R. 42 that is inconsistent with substantial justice. *See Courtney*, 2025-Ohio-2335, at ¶ 58 (1st Dist.); *see also Jones*, 2024-Ohio-1776, at ¶ 26 (1st Dist.).

**{¶141}** In support of its reliance on the "unfair prejudice" standard set forth in *Courtney* to resolve this issue, the majority opinion posits that *Courtney* and I "agree that there is a prejudice analysis involved in determining whether trials were properly joined." Yet, the issue is not so simple.

**{¶142}** Whether the actions were properly joined initially under Civ.R. 42 and whether the joinder—even where proper—resulted in certain errors or defects at trial that were prejudicial to the complaining party are two separate inquires.

**{¶143}** Civ.R. 42 governs the first inquiry. By its plain language, it is applicable prior to trial. Prejudice may certainly be relevant prior to trial as Civ.R. 42(B) expressly provides that, to avoid prejudice, a trial court may order a separate trial "of one or more separate issues, claims, cross-claims, counterclaims, or third-party claims."

**{¶144}** The majority opinion points to several federal cases for its position that "[o]ther courts that have considered whether joinder is proper under Civ.R. 42 have used the term 'unfair prejudice.'" *See Equal Emp. Opportunity Comm. v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998) (citing Fed.R.Civ.P. 42(b) for the principle that consolidation is inappropriate where it "leads to inefficiency, inconvenience, or unfair prejudice to a party"); *Morehead v. Petersen*, 2024 U.S. Dist. LEXIS 153917 (W.D. Ark. Aug. 27, 2024) (a decision of a federal magistrate judge granting a motion to consolidate under Fed.R.Civ.P. 42(a) after considering whether consolidation would be prejudicial to any of the parties); *Molesky v. State Collection & Recovery Servs., LLC*, 2013 U.S. Dist. LEXIS 97951 (N.D. Ohio July 12, 2013) (a decision of a federal district court judge denying a motion to consolidate, without actually considering prejudice, after finding that consolidation was not the "proper course of action" where each action was literally identical, the second action having only been filed for fear of missing a statute of limitations pending a motion to amend in first action, which was later granted); *Hart v. J.H. Baxter & Co., Inc.*, 2021 U.S. Dist. LEXIS 270823, *5 (E.D. Or. Nov. 4, 2021) (a decision of a federal magistrate judge denying a motion to consolidate two class actions where the cases did not involve common questions of law

and fact and consolidation would result in delay and possible confusion).[13]

**{¶145}** However, the potential of prejudice prior to trial is not the issue before this court. The majority opinion acknowledges that no specific claim of prejudice was raised regarding these precise cases prior to trial. Thus, this court is not addressing whether the trial court erred in failing to recognize potential prejudice when joining the actions under Civ.R. 42.[14]

**{¶146}** Here, the argument at issue is a claim of actual prejudice based on alleged deficiencies that occurred at trial as a result of the joinder.[15] This is a completely different inquiry. On this point, as indicated above, this court has engaged in the appropriate substantive analysis when addressing this issue.

**{¶147}** Therefore, I concur with the majority's resolution of the first assignment of error as reversal on the basis of the alleged actual prejudice is not warranted in this case.

---

[13] Notably, all the district court cases rely—either directly or indirectly—on *HBE Corp.* for the proposition that consolidation is inappropriate if it leads to inefficiency, inconvenience, or unfair prejudice to a party (*Hart* cites *Wilson v. HGC, Inc.*, 2016 U.S. Dist. LEXIS 110775, *1 (D. Or. Aug. 18, 2016), which cites *HBE Corp.*). Thus, all these cases are rooted only in the (b) provision of Fed.R.Civ.P. 42(b), which is analogous to Civ.R. 42(B). I find it notable that this provision does not contain the phrase "unfair prejudice." Nevertheless, this provision is not at issue here.

[14] I note that, even if this issue were before this court and we determined that the trial court erred when deciding whether to join—or not join—any or all parts of the actions under Civ.R. 42 due to potential prejudice, this court would nevertheless still need to engage in an analysis under Civ.R. 61 to determine whether there was reversible error where the trial has already occurred. *See generally, e.g., Meng Huang v. Ohio State Univ.*, 116 F.4th 541, 567-566 (6th Cir. 2024) (assessing whether the outcome would have been different absent the errors held to have been made by the trial court under Fed.R.Civ.P. 42). However, even where all roads lead to the same ultimate inquiry, this court must still distinguish between the stages. While a trial court making a pre-trial determination under Civ.R. 42 may be able to assess the *potential* for prejudice, there is no way for a trial court to apply a standard, pretrial, of whether the joinder actually resulted in prejudice sufficient to warrant a new trial. Thus, it is important for this court to recognize the proper standard for the stage of the proceedings at issue. Were this court to assess how prejudice should come into play when conducting a pretrial assessment under Civ.R. 42, then the standard should be one that a trial court can utilize pretrial. This court has yet to set forth such a standard. Nevertheless, we leave that issue for another day as that issue is not presently before this court.

[15] I note that an "unfair prejudice" argument relevant to joinder could also be made under Civ.R. 59(A). However, no such argument has been raised. So, we leave that argument for another day.

## II. Punitive Damages

{¶148} In the third assignment of error, appellants specifically argue that the trial court "erred in entering judgment in the amount of $380,691.21 for Ms. Reeder and $348,060.84 for Mr. Pridemore."

{¶149} While the total award of damages includes punitive damages, it also includes other items of damages. Rather than fashioning arguments or challenges beyond those invoked by the parties, I allow the arguments and issues lodged by the appellants to provide the context of the error raised. *See Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4, quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("Under the principle of party presentation, 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'").

{¶150} For Ms. Reeder, the $380,691.21 judgment includes (1) $103,519 in compensatory damages, (2) $207,038 in punitive damages, (3) $30,000 in attorney fees, and (4) $40,134.21 in prejudgment interest. Of the $103,519 in compensatory damages, $38,519.04 was awarded for past medical expenses.

{¶151} For Mr. Pridemore, the $348,060.84 judgment includes (1) $94,486 in compensatory damages, (2) $188,966 in punitive damages, (3) $30,000 in attorney fees, and (4) $34,611.84 in prejudgment interest. Of the $94,486 in compensatory damages, $44,483 was awarded for past medical expenses.

{¶152} In support of their assignment of error challenging the court's entry of judgment in favor of the appellees in these aggregate amounts, the appellants present three issues for review: (1) the trial court should not have allowed plaintiffs to pursue a claim for past medical expenses at trial, (2) the trial court should not have awarded prejudgment interest, (3) and the trial court should have allowed a set off. I concur in

the majority's resolution of the arguments pertaining to past medical expenses, prejudgment interest, and a set off. However, I must concur in judgment only on the majority's resolution of the argument relating to punitive damages.

{¶153} In *Saylor*, 2020-Ohio-3647 (1st Dist.), the appellant raised an assignment of error arguing that the trial court abused its discretion by failing to properly weigh all the evidence and asserted several arguments in support of this assignment of error. *Id.* at ¶ 22-30. One of the arguments had nothing to do with the trial court's weighing of the evidence and instead asserted that the trial court erred in accepting an agreed entry in violation of a local rule on the basis that he was not represented by counsel at the time. *Id.* at ¶ 28. This court declined to reach the merits of this argument, holding that the appellant did not properly invoke the authority of this court to review the alleged error where the error was raised as a "mere argument," rather than an assignment of error. *Id.* at ¶ 29.

{¶154} In *Courtney*, 2025-Ohio-2335 (1st Dist.), the appellants raised an assignment of error arguing that the trial court erred in allowing the plaintiffs "to recover monetary damages for their past medical expenses without joining as parties the insurance companies that actually paid those expenses." *Id.* at ¶ 91. One of the arguments raised in support of the assignment of error was that the past medical expenses should not have been included when calculating the cap on punitive damages. *Id.* at ¶ 97. Relying on *Saylor*, this court declined to reach the merits of this argument where the appellants did not raise an assignment of error regarding punitive damages. *Id.*

{¶155} Here, as shown above, the appellants' third assignment of error is a broad assignment of error challenging the aggregate monetary judgments in favor of the plaintiffs. However, they ultimately only raise issue with three precise aspects of

these awards: (1) past medical expenses, (2) prejudgment interest, and (3) set off. Neither the third assignment of error nor any of the issues presented for review under the third assignment of error raise any error related to punitive damages. Rather, the issue of punitive damages is raised as a "mere argument."

{¶156} Relying on *Courtney*, the majority opinion declines to address the appellants' joinder arguments under the first issue presented for review—regarding past medical expenses—where the appellants did not raise an assignment of error pertaining to joinder. Yet, the opinion then proceeds to address the issue of punitive damages even though the appellants similarly failed to raise an assignment of error regarding punitive damages.

{¶157} Because doing so conflicts with this court's precedent in *Courtney*, 2025-Ohio-2335, at ¶ 97 (1st Dist.), I must decline to join in this part of the majority's opinion resolving the issue of punitive damages.

{¶158} Beyond that, the appellants raised the issue of punitive damages only within a sub-argument related to joinder. They argue that the failure to join the subrogated insurers was prejudicial to them, even where the trial court protected them from double damages, as the past medical expenses were included in the calculation of the punitive-damages cap. If this court is declining to address the issue of joinder on the basis that no assignment of error was raised related to joinder, then we should similarly decline to address any argument pertaining to prejudice from the failure to join the insurers, without recasting the argument into an issue that was never raised.

{¶159} Significantly, the appellants do not cite any legal authority in support of their position on punitive damages. For these reasons, I would overrule the argument pertaining to punitive damages. Consequently, I concur only in the majority's judgment on this issue.

### *III. Conclusion*

{¶**160**} In conclusion, I concur with the majority's opinion on the first assignment of error, subject to a caveat—set forth above—regarding the proper postjudgment considerations when assessing prejudice from the joinder of trials under Civ.R. 42.

{¶**161**} I further concur with the majority's opinion on the second and third assignments of error, with the exception that I concur in judgment only regarding punitive damages under the third assignment of error.